# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J.  Fisher, Jr.                                                    Elisabeth A. Shumaker
Clerk                                                                       Chief Deputy Clerk

July 19, 1999

**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   98-6196, *Hooks v. Ward*
Filed on July 16, 1999

The slip opinion filed in this matter contains two clerical errors.  First, on pages 10-11, the citation sentence that begins at the end of page 10, and continues to the top of page 11, should read:

See Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999).

Second, the citation sentence that begins on page 45 and continues to the top of page 46, should read as follows:

See Walker v. Attorney General for the State of Oklahoma, 167 F.3d 1339, 1349-50 (10th Cir. 1999) (evidence did not support a lesser included offense instruction); Stouffer v. Reynolds, 168 F.3d 1155, 1170-71 (10th Cir 1999) (same).

Please make the corrections to your copy of the opinion.

Sincerely,
Patrick Fisher, Clerk


By:   Keith Nelson
Deputy Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VICTOR WAYNE HOOKS,

      Petitioner-Appellant,

v.

RON WARD, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 98-6196

---

**Appeal from the United States District Court**
**for the W.D. Okla.**
**(D.C. No. CIV-96-732-M)**

---

Vicki Ruth Adams Werneke, Assistant Federal Public Defender (Janet Chesley, Assistant Federal Public Defender and Patrick J. Ehlers, Jr., Assistant Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for Petitioner-Appellant.

Sandra D. Howard, Assistant Attorney General, Chief, Criminal Appeals (W. A. Drew Edmondson, Attorney General of Oklahoma, with her on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **ANDERSON**, **TACHA** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge, delivered the opinion of the court except as to part III.C.

In May 1989, an Oklahoma jury convicted Victor Wayne Hooks of first degree murder and first degree manslaughter for beating to death, respectively, his common-law wife and the 24-week-old fetus she was carrying. After a one-day sentencing hearing, Hooks was sentenced to death on the murder conviction and to 500 years' imprisonment on the manslaughter conviction. On December 2, 1996, after direct and collateral appeals in the Oklahoma courts, Hooks filed a petition for writ of habeas corpus in the United States District Court for the Western District of Oklahoma pursuant to 28 U.S.C. § 2254. The district court denied Hooks' petition on all thirteen grounds advanced, and granted a certificate of appealability ("COA") under 28 U.S.C. § 2253 as to Hooks' claims of ineffective assistance of trial counsel and denial of a fair trial. Hooks filed a timely appeal in this court and requested that we grant a COA on several additional issues raised before the district court. We granted Hooks a COA on Issues I (ineffective assistance of trial and/or appellate counsel), II (trial court failure to instruct the jury on lesser included offenses), and V (constitutionality of certain aggravating sentencing factors), as raised in Hooks' brief on appeal. We REMAND for the district court to consider the adequacy of the state's claim of procedural bar on all but one of Hooks' claims of ineffective trial counsel. As to all other issues as to which a certificate of appealability has been granted, we AFFIRM.

## BACKGROUND

At approximately 7:00 p.m. on October 6, 1988, defendant Hooks showed up at the home of Ms. Virginia Plumley, the mother of his putative common-law wife, Shalimein Blaine, and told her that Shalimein had been beaten and raped. Hooks, father of Shalimein's then-one-year old daughter Vargus Shalimar and the father of the fetus she was carrying, implored Ms. Plumley to check on her daughter Shalimein — who had just moved into an apartment less than a block away from Ms. Plumley — and to take her to the hospital. When Ms. Plumley asked Hooks what happened to Shalimein, he responded that he did not know.

After the badly beaten Shalimein had been taken down the stairs of her apartment building and placed in Hooks' Cadillac, Ms. Plumley asked Hooks again what had happened. On the drive to the hospital Hooks told a number of stories to the effect that Shalimein had taken a walk earlier in the evening, and after about two hours had returned, knocked on the door or entered her upstairs apartment, and fell into his arms beaten and bloodied. At that point, Hooks said that either he removed her clothes or she removed them herself so he could wash her in the bathtub. During the drive, Ms. Plumley noticed that Shalimein's hair was shaven and her face "was swollen real bad." Ms. Plumley told Hooks that she thought Shalimein was dead, which made him "hysterical" and prompted him

- 3 -

to exclaim, "That's my baby, she's not dead," and "I'm going to kill" the people who did this.

Ms. Plumley asked Hooks why he had shaved Shalimein's head. He said that he had not done it and that it must have been the person who raped and beat her. When they arrived at the hospital, Hooks carried Shalimein into the hospital, asking everybody to get out of his way because "his baby had to have medical attention." After handing Shalimein over to hospital staff, Hooks called the police (but Ms. Plumley testified that since the police arrived "about a minute or two after" Hooks called, she believed someone else had called first). As doctors began efforts to revive Shalimein,[1] the police interviewed Hooks, Ms. Plumley, and her daughter Amanda.

During the preliminary investigation by Oklahoma City Police Officer Robert Ardle, Hooks told essentially the same story he had told Ms. Plumley. Then, while still at the hospital, Hooks signed a search warrant authorizing a search of Shalimein's apartment. In the apartment, officers found her hair in a trash can, as well as blood on the bed, on the carpet near the bed, and on several wash cloths and towels that had been thrown in a clothes hamper. Outside

---

[1]While her doctors succeeded in reestablishing Shalimein's heartbeat for a short time, she was pronounced dead at 9:16 a.m. on October 7, 1988. An ultrasound revealed that the twenty-four week old, unborn fetus she was carrying was dead as a result of a blunt force that had ruptured its liver as well as bruises to its abdomen and head.

Shalimein's apartment, in a trash dumpster, police found bloody clothing and wash cloths as well as a large clump of hair.

In the course of the investigation, Hooks was interviewed by Oklahoma Police Detectives Eric Mullenix and Randy Scott at approximately 1:00 a.m. on October 7th. At first, Hooks told the detectives a version of the same story he had told Ms. Plumley and Officer Ardle; however, after the detectives confronted him with questions about the hair and blood found in the apartment and the nearby dumpster, Hooks broke down crying and explained that he wanted to come clean. Hooks admitted that he and Shalimein had fought on the evening of October 6, 1988. He explained that their verbal fight over money escalated into a physical one when Shalimein slapped him in the face. Hooks admitted that he struck Shalimein with his fist, and that when she fell to the floor by the bed, he began kicking her in the stomach and the face "real hard." Hooks admitted that he beat her until she lay still on the floor with blood coming from her mouth and nose.

At that point, Hooks explained that he picked her up, took her into the bathroom, removed her clothes, and began trying to clean her up in the bathtub. In response to the detectives' inquiry about why they had found hair in the dumpster, Hooks said that he had shaved some of her hair with a razor in an effort to locate her head injuries. He further explained that Shalimein was having

trouble breathing and that she eventually lost consciousness, at which point he began cleaning up the apartment and the couple's one-year old daughter Vargus Shalimar, who had gotten blood on her in the course of witnessing Hooks beat her mother. The detective then stopped the interview and asked if Hooks would restate his new story on audio tape. Hooks agreed. That tape was played for members of the jury, who were also provided with a written transcript in order to follow along.

At trial, in an effort to show the graphic and violent nature of the beating that caused Shalimein's death the state put on Oklahoma City Police Lieutenant Tom Bevel, an expert in geometric blood stain pattern interpretation and crime scene reconstruction. Lieutenant Bevel testified that the blood stains found on the blue jeans Hooks was wearing when he beat Shalimein to death were consistent with the state's theory that Hooks "stomped" Shalimein.

The state also presented the testimony of Shanna K. (Allen) Dinh, a former girlfriend of Hooks. Ms. Dinh testified that she began a sexual relationship with Hooks when she was 13 years-old — approximately 10 years his junior — and earned money for Hooks through prostitution and nude dancing. Ms. Dinh testified that Hooks was a violent man, and that if one of his girls refused to follow his orders she "got [her] butt kicked." Further, she explained that

"whenever [Hooks] would get mad, he would look at us and say, 'One of these days I'm going to end up killing one of you bitches.'"

Ms. Dinh testified that she had Hooks' child when she was 15 years-old ; and, that when she became pregnant for the second time with Hooks, "[a] beating by Victor [Hooks]" caused a miscarriage. She explained that Hooks had informed her and all the other women with whom he was involved that "if anyone ever got pregnant again [a second time], that he was going to kick it out of their ass."

As to Shalimein's second pregnancy (the one she was in when Hooks killed her), Ms. Dinh testified that Hooks said "he didn't want no more babies and that he was mad because she was pregnant again." Moreover, Ms. Dinh testified that she saw Hooks inflict violence on Shalimein "several" times, including one beating approximately one month prior to the fatal beating, during which Hooks hit Shalimein with a two-by-four, then "pushed her down on the couch, . . . spread her legs open and . . . kick[ed] her in her vagina [with cowboy boots], saying that he doesn't want this baby."

At trial, Hooks' attorney conceded that Hooks killed Shalimein, but argued that he did so unintentionally. Based on this theory, Hooks' counsel moved the trial court to instruct the jury on the lesser included offenses of second degree murder and first degree manslaughter as to Shalimein. The judge refused, and instead instructed the jury only on first degree murder.

After the foregoing events had been introduced over a two-day trial and the court issued its instructions, an Oklahoma jury convicted Hooks of first degree murder for intentionally causing Shalimein's death, and of first degree manslaughter for causing the death of the unborn quick fetus she was carrying. After a one-day sentencing hearing, during which Hooks' counsel put on the testimony of an Oklahoma County Deputy Sheriff, a clinical psychologist, and Hooks' mother and sister, the jury fixed Hooks' sentence at death for Shalimein's murder and at 500 years' imprisonment for the manslaughter of the unborn child. Regarding Shalimein's murder, the jury specifically found that three statutory aggravating circumstances supported a death sentence: (1) Hooks had been previously convicted of a felony involving the use or threat of violence to a person; (2) the murder was especially heinous, atrocious, or cruel; (3) there existed a probability that Hooks would commit criminal acts of violence that would constitute a continuing threat to society. On May 19, 1988, the trial judge sentenced Hooks to death in accordance with the jury's recommendation.

Hooks' trial counsel filed a direct appeal in the Oklahoma Court of Criminal Appeals. On September 7, 1993, that court affirmed Hooks' conviction and sentence. Hooks v. State of Oklahoma, 862 P.2d 1273 (Okla. Crim. App. 1993) (Hooks I). Hooks' new counsel then filed an application for state postconviction relief, which was denied by the District Court of Oklahoma

County, Oklahoma, on December 9, 1994. On September 18, 1995, the Oklahoma Court of Criminal Appeals affirmed the denial of postconviction relief. Hooks v. State of Oklahoma, 902 P.2d 1120 (Okla. Crim. App. 1995) (Hooks II).

On December 2, 1996, Hooks filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Western Oklahoma. Hooks raised thirteen issues before the federal district court, many of which directly alleged, or were tied to allegations of, ineffective assistance of counsel. Prior to ruling on Hooks' petition, the district court conducted an evidentiary hearing on April 3- 4, 1997. During the federal evidentiary hearing, Hooks' counsel put on the testimony of Hooks' mother, Clara Hooks; his ex-wife, Virginia Betts; Hooks himself; an expert in psychology and neuropsychology, Dr. Michael Gelbort; Hooks' counsel on direct appeal, Robert Boren and Patrick Lavelle; Hooks' trial counsel, Ron Evans; and an expert in death penalty defense, David Ruhnke. Hooks' counsel also introduced into evidence an affidavit of Hooks' sister, Vargas Hooks. After the evidentiary hearing and briefing from both sides, the district court denied Hooks' petition on all thirteen grounds. Pursuant to 28 U.S.C. § 2253, the district court issued a certificate of appealability ("COA") as to Ground I (ineffective assistance of trial

counsel) and Ground II (denial of right to a fair trial because of the court's exclusion of the proffered expert testimony of two clinical psychologists)[2].

On appeal, Hooks raises essentially all the claims denied by the district court and requests that we grant a COA as to the claims the district court had refused. We granted a COA on the following issues: (1) whether Hooks received ineffective assistance of counsel at trial, and/or on appeal; (2) whether Hooks was denied his constitutional right to due process and a fair trial by the trial court's failure to instruct the jury on lesser-included offenses to first degree murder; and (3) whether the sentencing phase instructions regarding aggravating factors were unconstitutional.[3]

## DISCUSSION

**I.      Applicability and standards under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").**

Because Hooks filed his habeas petition after AEDPA's April 24, 1996 effective date, AEDPA governs our review of the instant habeas petition. See

---

[2]Despite the district court granting Hooks a COA on the issue of whether Hooks was denied his right to a fair trial by the trial court's exclusion at stage one of the testimony of Dr. Philip J. Murphy regarding Hooks' mental state at the time of the killing, Hooks does not press this issue as an independent ground for relief before this court. Instead, Hooks raises this claim only in the context of his lesser included offense argument. Accordingly, we address it in our discussion of that issue. See infra, Section III.

[3]We denied a COA as to all other issues raised on appeal.

Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999).

Accordingly, we may not grant Hooks' application for a writ of habeas corpus:

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).


## II.     Whether Hooks received ineffective assistance of counsel at trial and on appeal.

A. State Procedural Bar

As an initial matter, the appellee asserts state procedural bar because Hooks failed to raise his claims of ineffective assistance of counsel on direct appeal in the Oklahoma courts. "On habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).

- 11 -

On direct appeal, Hooks raised only one issue of ineffective assistance of trial counsel. All of his other claims of ineffective assistance of trial counsel were first raised in his state postconviction proceeding. His direct appeal claim was denied on the merits, see Hooks I, 862 P.2d at 1283, and his other ineffective counsel claims raised in his application for postconviction relief were denied on the grounds of "res judicata," see Hooks II, 902 P.2d at 1122 & n.4.

As a matter of state law, Oklahoma generally bars review in postconviction proceedings of ineffective assistance of trial counsel claims not raised on direct appeal. See Okla. Stat. Ann. tit. 22, § 1086; Brecheen v. Reynolds, 41 F.3d 1343, 1363 (10th Cir. 1994). Such state procedural bar will foreclose federal habeas review if it is independent and adequate. See Messer v. Roberts, 74 F.3d 1009, 1015 (10th Cir. 1996).

In English, we traced the development of the law in this circuit regarding state procedural bars for ineffective assistance of counsel claims. See 146 F.3d at 1259-61. "In Brecheen, this court found inadequate the Oklahoma procedural requirement that all ineffective assistance of trial counsel claims be raised on direct appeal or forfeited." Id. at 1259 (citing Brecheen, 41 F.3d at 1363-64). Brecheen relied on the Supreme Court's decision in Kimmelman v. Morrison, 477 U.S. 365 (1986), which recognized that the general rules of procedural bar arising from the failure to raise a claim on direct appeal were not well-suited to

- 12 -

ineffective assistance of counsel claims, "[b]ecause collateral review will frequently be the only means through which an accused can effectuate the right to counsel" due to the fact that "[a] layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance" without the assistance of a trained lawyer, which he is unlikely to receive until after the trial and appeal are completed. 477 U.S. at 378. In Brecheen we observed that:

> The practical effect of [Oklahoma's procedural bar] is to force [an accused] either to raise [an ineffective assistance of counsel] claim on direct appeal, with new counsel but without the benefit of additional fact-finding, or have the claim forfeited under state law. This Hobson's choice cannot constitute an adequate state ground under the controlling case law because it deprives [an accused] of any meaningful review of his ineffective assistance claim.

41 F.3d at 1364. Thus, we concluded in Brecheen that the Oklahoma procedural bar on ineffective assistance of trial counsel claims not raised on direct appeal was inadequate and could not preclude federal habeas review. See Brecheen, 41 F.3d at 1364.

Nearly four years after Brecheen, we revisited the issue in English. There, the appellant-warden argued that Brecheen "is built on a faulty premise: a perceived inability of habeas petitioners to develop factual issues on a direct appeal to the Oklahoma Court of Criminal Appeals." English, 146 F.3d at 1260. The warden claimed that "evidentiary hearings are available as part of the direct appeal process in Oklahoma," thus Brecheen's rationale could no longer support

its result. Id. After a study of the caselaw, English clarified the rule in this circuit:

> Kimmelman, Osborn, and Brecheen do not establish a rigid constitutional rule prohibiting Oklahoma from requiring the presentation of ineffective assistance of trial counsel claims on direct appeal. Instead, those cases identify the importance of the Sixth Amendment right to counsel and mandate that no state procedure for resolving claims of ineffective assistance will serve as a procedural bar to federal habeas review of those claims unless the state procedures comply with the imperatives set forth in Kimmelman: (1) allowing petitioner an opportunity to consult with separate counsel on appeal in order to obtain an objective assessment of trial counsel's performance and (2) providing a procedural mechanism whereby a petitioner can adequately develop the factual basis of his claims of ineffectiveness.

Id. at 1262-63 (footnotes omitted).

Petitioners in English asserted that the Oklahoma procedural bar was inadequate because it failed to meet the second requirement articulated above, i.e., to provide "a procedural mechanism whereby a petitioner can adequately develop the factual basis of his claims of ineffectiveness." Id. Specifically, the petitioners there claimed that:

> (1) the rule which apparently grants the Oklahoma Court of Criminal Appeals the power to remand a claim of ineffective assistance of counsel to the trial court for additional factual development, Okla. Stat. Ann. tit. 22, ch. 18, app., Rules of the Court of Criminal Appeals, Rule 3.11 (hereinafter "Rule 3.11"), has been amended frequently in the last decade; (2) the remand provisions of Rule 3.11 are far too narrow to adequately allow development of ineffective assistance claims to comply with the second Kimmelman imperative; (3) even if Rule 3.11 were sufficient to comply with the second Kimmelman imperative, the Oklahoma Court of Criminal Appeals

- 14 -

merely pays lip-service to the Rule and never remands for factual development of ineffectiveness claims; and (4) the Oklahoma Court of Criminal Appeals generally resolves ineffective assistance claims in such a cursory manner that it is usually impossible to tell from the opinion whether additional fact-finding was necessary to adequately resolve the claim.

Id. at 1263-64.

Because it was unclear in English whether petitioners' ineffectiveness claims could have been resolved on the record alone or whether they needed further factual development, the court did not reach the issue of the adequacy of the Oklahoma remand procedure under Rule 3.11. Instead, we remanded to the federal district court for "a determination of whether these claims embrace matters in the trial record or whether they require enlargement of that record or additional fact-finding." Id. at 1264.

Applying these principles to Hooks, it is clear that Hooks failed to raise on direct appeal all but one of the claims of ineffectiveness of trial counsel he now asserts.[4] In his direct appeal in Oklahoma state court, Hooks was not represented by the same lawyer who defended him at trial. Thus, the first Kimmelman requirement is met.

---

[4]On direct appeal, the only ground Hooks advanced in support of his claim of ineffective assistance of trial counsel contended "that defense counsel was ineffective because Hooks was not allowed to testify during either the first or second stage of trial." Hooks I, 862 P.2d at 1283.

Before addressing the second Kimmelman requirement, we must address a preliminary argument advanced by Hooks. Hooks claims that the Oklahoma Court of Criminal Appeals did not rely on procedural bar in denying his other claims of ineffective assistance of trial counsel raised in his application for postconviction relief before the Oklahoma state courts, but rather, resolved all those ineffectiveness claims on their merits by invoking the doctrine of res judicata. If a state court decides an issue on the merits, state procedural bars will not preclude federal habeas review. See Ylst v. Nunnemaker, 501 U.S. 797, 801-03 (1991).

In affirming the denial of postconviction relief to Hooks on his claims of ineffective trial counsel, the Oklahoma Court of Criminal Appeals stated:

> We note that Hooks's application for post-conviction relief alleges thirteen instances of trial counsel ineffectiveness which he did not directly raise and this Court did not explicitly consider when analyzing this issue on direct appeal. Yet, the fact remains that trial counsel's ineffectiveness was brought to this Court's attention on direct appeal. Accordingly, we consider this issue [ineffectiveness of trial counsel] — and all instances of trial counsel ineffectiveness which could have been raised but were not — res judicata for purposes of Hooks's post-conviction appeal. But cf. U.S. v. Galloway, 56 F.3d 1239, 1241-42 (10th Cir. 1995) (fact that ineffective assistance of counsel claim is raised and adjudicated on direct appeal will not procedurally bar an ineffectiveness claim in a collateral proceeding where new instances of ineffectiveness are advanced in support of that claim).

Hooks II, 902 P.2d at 1122 n.4.[5]

---

[5]In denying Hooks' application for postconviction relief in the first

(continued...)

Focusing on the court's use of the term "<u>res judicata</u>," Hooks argues that the Oklahoma Court of Criminal Appeals' decision affirming denial of postconviction relief constitutes a ruling on the merits as opposed to a procedural bar. We disagree.

It is clear that the Oklahoma Court of Criminal Appeals views <u>res judicata</u> for ineffective assistance of trial counsel claims as a procedural bar and not a ruling on the merits. See <u>Slaughter v. State of Oklahoma</u>, 969 P.2d 990, 995 (Okla. Crim. App. 1998) ("Petitioner claims he was denied the effective assistance of both trial and appellate counsel . . . . The issue of ineffective assistance of counsel was raised and addressed on direct appeal. Therefore, further consideration of the issue is barred by <u>res judicata</u>. Despite the <u>procedural bar of res judicata</u>, a claim of ineffective assistance of trial counsel can be brought for the first time on post-conviction, but only if it requires fact-finding outside of the direct appeal record . . . ." (emphasis added and citations omitted)); <u>Turrentine v. State of Oklahoma</u>, 965 P.2d 985, 987-88 (Okla. Crim. App.) ("In Propositions II and IV, [Petitioner] argues he was denied the effective assistance

---

[5](...continued)
instance, the Oklahoma state district court similarly stated: "Proposition[] II [Hooks' ineffective assistance of trial counsel claim] . . . [was] addressed by the appellate court on direct appeal and [is] therefore barred by the doctrine of <u>res judicata</u>. <u>Jones v. State</u>, 704 P.2d 1138 (Okl.Cr.1985), <u>Coleman v. State</u>, 693 P.2d 4 (Okl.Cr.1984)." (<u>Hooks v. State of Oklahoma</u>, No. CRF-88-5642, at 7 (Okla. Co. Ct. 7th Dist. Dec. 9, 1994).)

of trial counsel . . . . Despite the <u>procedural bar of res judicata</u>, a claim of ineffective assistance of trial counsel can be brought for the first time on post-conviction, but only if it requires fact-finding outside of the direct appeal record." (emphasis added)), <u>cert. denied</u>, 119 S. Ct. 624 (1998). <u>Cf.</u> <u>United States v. Galloway</u>, 56 F.3d 1239, 1242-43 (10th Cir. 1995) (in banc), (holding that "the fact that an ineffectiveness claim is raised and adjudicated on direct appeal will not procedurally bar an ineffectiveness claim in a proceeding under 28 U.S.C. § 2255, where new reasons are advanced in support of that claim.")

Turning then to the second prong of <u>Kimmelman</u>, it is clear that Hooks' claims of ineffective assistance of trial counsel required further development of the record. Consequently, we are presented with the question whether Oklahoma's remand procedure is adequate.

Because the record below is largely silent on the adequacy of Oklahoma's Rule 3.11, the resolution of this issue on appeal will depend on which party has the burden of proof to establish the adequacy or inadequacy of the state procedures. The Fifth Circuit places that burden on the petitioner. <u>See</u> <u>Stokes v. Anderson</u>, 123 F.3d 858, 860 (5th Cir. 1997) ("The petitioner bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his direct appeal [in cases similar to his].”), <u>cert. denied</u>, 118 S. Ct. 1091 (1998); <u>see also</u> <u>Robison v. Johnson</u>, 151 F.3d 256, 263 n.4 (5th Cir. 1998),

cert. denied, 119 S. Ct. 1578 (1999); Martin v. Maxey, 98 F.3d 844, 847 (5th Cir. 1996); Amos v. Scott, 61 F.3d 333, 340-41 (5th Cir. 1995). By contrast, two federal district courts in California have placed the burden of proving the adequacy of a state procedural bar on the state. In declaring a California state procedural bar inadequate to foreclose federal habeas review, the United States District Court for the Eastern District of California stated in Karis v. Vasquez, 828 F. Supp. 1449 (E.D. Cal. 1993):

> Without citation to authority, the respondents assert that the burden of demonstrating that procedural default rules are not regularly and consistently applied rests with petitioner. I cannot agree. Procedural default is an affirmative defense which may be waived. Moreover, it is respondents who seek a dismissal, and ordinarily under such circumstances the burden rests with the proponent of the defense and of the motion.

Id. at 1463 n.21 (citations omitted). See also Coleman v. Calderon, No. C-89-1906-RMW, 1996 WL 83882, at *3 (N.D. Cal. Feb. 20, 1996) (Unpublished Order), aff'd on other grounds by 150 F.3d 1105 (9th Cir.), rev'd on other grounds by 119 S. Ct. 500 (1998).

There is no doubt that "state-court procedural default . . . is an affirmative defense," and that the state is "obligated to raise procedural default as a defense or lose the right to assert the defense thereafter." Gray v. Netherland, 518 U.S.

152, 165-66 (1996).[6]  In addition, the state is undoubtedly in a better position to

establish the regularity, consistency and efficiency with which it has applied Rule

3.11 in the past to allow direct appellants to develop a factual record challenging

the adequacy of trial counsel than are habeas petitioners, who often appear pro se,

to prove the converse.  Cf. 2 McCormick on Evidence § 337, at 431 (John W.

Strong ed., 4th ed. 1992) ("If proof of the facts is inaccessible . . . it is usually

fairer . . . to place the burden of proof and persuasion on the party claiming its

existence.").  Accordingly, we conclude that the state bears the burden of proving

the adequacy of a state procedural bar in order to preclude federal habeas review.[7]

This is not to say, however, that a petitioner has no responsibility to put the

adequacy of the state procedural bar at issue before the state is required to come

forward with its proof.  Once the state pleads the affirmative defense of an

independent and adequate state procedural bar, the burden to place that defense in

---

[6]Traditionally the burden of proving an affirmative defense falls on the party asserting the affirmative defense.  See Oklahoma Radio Assocs. v. FDIC, 987 F.2d 685, 693 (10th Cir. 1993) (citing Paul v. Monts, 906 F.2d 1468, 1474 (10th Cir. 1990) ("Estoppel is an affirmative defense upon which the defendant has the burden of proof.")); Jackson v. Robertson, 763 F.2d 1176, 1183 (10th Cir. 1985) ("[T]he burden of proof . . . is upon the defendant as to all affirmative defenses which he sets up . . . ." (internal quotations omitted)).

[7]Cf. Boyd v. Ward, No. 98-6309, 1999 WL 370418, at *18 n.1 (10th Cir. June 8, 1999) (refusing to apply procedural bar to an ineffective assistance of trial counsel claim because, inter alia, "it is unclear whether Oklahoma's special remand rule is adequately and evenhandedly applied," thus arguably placing the burden of non-persuasion on the state).

issue shifts to the petitioner. This must be done, at a minimum, by specific allegations by the petitioner as to the inadequacy of the state procedure. The scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner.

Here, the state pled the defense of an adequate and independent state procedural bar, as it was required to do. However, Hooks thereafter failed to meet his burden of placing in issue the adequacy of the procedural bar. Nevertheless, we believe Hooks' failure should be excused in this case in light of the peculiar timing of the proceedings below. Hooks filed his habeas petition in federal district court on December 2, 1996 — more than two years after Brecheen was decided and almost two years before English was decided. The district court denied Hooks' petition on March 30, 1998 — three months before we issued our opinion in English. In this posture, we cannot say that either Hooks or the district court was in error in relying upon the widely-understood holding in Brecheen that federal habeas review of ineffective assistance of counsel claims is not barred by Oklahoma's rule that criminal defendants must raise all claims on direct review or waive them.

Understandably, here neither party addressed the kind of factual inquiry into the adequacy of Oklahoma's Rule 3.11 that was suggested by English. Accordingly, as we did in English, we think it most appropriate here to remand to

the district court for a determination of whether Oklahoma's state procedural bar should preclude federal habeas review of Hooks' claims of ineffective assistance of counsel not raised on direct appeal.

On remand, if Hooks believes Oklahoma's procedural bar to be inadequate, he must place that issue before the district court in a clear way. Respondent-Appellee then bears the burden of proving the adequacy of Oklahoma's bar. If the district court finds Oklahoma's procedural bar to be adequate, the merits of Hooks' ineffectiveness claims need not be reached. If the court determines that Oklahoma's procedural bar is inadequate, the district court then need only reaffirm its previous rulings on the merits of Hooks' ineffectiveness claims and the merits analysis will then be appealable to this court.

Although a determination of the adequacy of the state procedural bar defense is a necessary prologue to our consideration of most of Hooks' claims of ineffective trial counsel, we can reach the merits of one of his ineffective trial counsel claims because Hooks did raise on direct state appeal one such claim.[8] In addition, we can consider on the merits Hooks' claim of ineffective assistance of appellate counsel because that claim was raised and decided on the merits in Hooks' state postconviction proceedings.

---

[8]See footnote 4.

B.  Merits

*1.  Did Hooks' trial counsel render ineffective assistance in not allowing Hooks to testify at trial?*

On direct appeal, the Oklahoma Court of Criminal Appeals stated that "Hooks contends that defense counsel was ineffective because Hooks was not allowed to testify during either the first or second, stage of trial."  Hooks I, 862 P.2d at 1283.  Before the federal district court and before this court, Hooks has pared his claim to an allegation that his trial counsel was ineffective only for "fail[ing] to allow Mr. Hooks to testify in the second stage."

Under AEDPA's amendments to § 2254(d), we cannot grant the writ of habeas corpus unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  Applying the general framework laid out in  Strickland v. Washington, 466 U.S. 668 (1984), we conclude that the Oklahoma Court of Criminal Appeals decision was neither "contrary to [nor] involved an unreasonable application of Federal law, as determined by the Supreme Court of the United States."  Thus we affirm the district court's denial of the writ on this claim.

In order to prevail on a claim of ineffective assistance of counsel, petitioner must demonstrate: "(1) that his counsel's performance fell below an objective

- 23 -

standard of reasonableness and (2) that the deficient performance was prejudicial to his defense." Hickman v. Spears, 160 F.3d 1269, 1273 (10th Cir. 1998) (citing Strickland, 466 U.S. at 688, 694 ). In Hickman, we explained the application of the Strickland standard:

> To satisfy the first prong of this test, petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. We review petitioner's ineffective assistance of counsel claim from the perspective of his counsel at the time he rendered his legal services, not in hindsight. In addition, in considering counsel's performance, we focus on not what is prudent or appropriate, but only what is constitutionally compelled. To satisfy the second prong, petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

160 F.3d at 1273 (citations and quotations omitted). "In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994) (quotation omitted).

In addressing this claim in Hooks' direct appeal, the Oklahoma Court of Criminal Appeals identified the proper standard under Strickland. See Hooks I, 862 P.2d at 1283. The court quoted a hearing conducted in the trial court's chambers at the end of the prosecution's case during the first phase of trial that clearly evidenced Hooks' understanding of his right to testify on his own behalf

and his personal decision not to testify.  Id.  The court then provided the following analysis:

> Whether a defendant will testify on his own behalf at a criminal trial is a decision properly left to the accused.  See Rule 1.2(a) of the Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3-A.  Assuming Hooks was influenced by defense counsel's advice, which may have suggested that he not testify, such advice is a matter of trial strategy and will not be considered ineffective assistance of counsel.  See Camron v. State, 829 P.2d 47, 54 (Okl. Cr. 1992).  Hooks has failed to establish defense counsel's performance was deficient.  Even if we were to assume that defense counsel's performance was deficient, he has failed to demonstrate any possibility that, but for counsel's errors, the result of the trial would have been different.  This assignment of error is denied.

Id.

While the state court opinion is a reasonable application of Strickland on its face, it is further corroborated by the testimony adduced at the federal evidentiary hearing in April 1997.  Testimony from the federal evidentiary hearing illustrates that Hooks' trial counsel's performance was not legally deficient.  Regarding Hooks' trial lawyer's decision not to call him as a witness during the penalty phase of the trial, the following exchange took place:

> "[Q.] Why did you decide not to present . . . Hooks as a witness in the second stage?
>
> A.   I didn't think he would make a good witness.
>
> . . .

[A.]  Was he a good witness on — was he ready to be a good witness on May, whatever day, the 10th, that he would have testified?  I didn't think so.  That was my call at the time.

I don't remember ordering him not to testify or telling him that he would not be allowed to testify.  I don't remember him insisting on testifying.

In light of <u>Strickland</u>'s command that "[j]udicial scrutiny of counsel's performance must be highly deferential," and its admonition not to indulge in the temptation to "second-guess counsel's assistance after . . . adverse sentence," 466 U.S. at 689, we cannot say that Hooks' counsel performed below the prevailing professional norms in advising Hooks not to testify at the sentencing phase of his trial.

Further, the April 1997 federal evidentiary hearing corroborates the Oklahoma Court of Criminal Appeals' conclusion, under <u>Strickland</u>'s second prong, that Hooks suffered no prejudice from his trial lawyer's advice not to testify at the second stage of his trial.  Hooks argues that his testimony from the evidentiary hearing established: (1) his love for his father and the disturbance he felt from watching his father yell at and beat his mother; (2) the problems he had after losing his father and brother through "traumatic events"; (3) the bias of Shanna Allen, one of the prosecution's witnesses; and (4) "[m]ost importantly," his love for Shalimein.  As to his love for Shalimein, Hooks argues that his testimony at the evidentiary hearing demonstrated: (1) his shock at killing her; (2)

- 26 -

that he did not "run away when he realized what he had done"; and (3) that he was "sorry" for killing her.

However, Hooks' jury heard similar sentiments regarding his love for Shalimein from Hooks himself, through the replay at trial of Hooks' taped confession to police. Therein, Hooks explained that he started arguing with Shalimein over money, and that at some point she slapped him, which prompted him to hit and then beat her. Hooks explained his dismay once he realized what he had done: "I fell back on the floor, I fell on the floor and I took the razor and I said God what have I done. And my baby was just lying there. And I was fixin break it off, cut my wrists." Hooks continued:

> Cut my wrists, my wrists. Cause I had hate what happened and I was fixing to cut my wrists. But something just wouldn't let me do it so go get her mother, go get some help. She wasn't breathing I felt her heart. I (unintelligible) Shalimein get up, I was grabbing her, holding her trying to make her get up, get up and she just kept flopping down and it scared me so bad I just grabbed the baby and run out of there.
>
> All I could think of was get help, get help. . . . I said come on get up now and quit playing joke on me come on get up, you know I didn't hurt you, come on we fight like this I'm sorry. I was saying that. And I glanced back in there and she still laying there, then all of the sudden I didn't feel no heart beating. I took a mirror, you know cause I watched it on T.V., they say that if you take a mirror and put it in some, in front of somebody's uh mouth if, if they don't, if it don't get foggy that means that they, something ain't right you know. And I hear heart beating and stop and then I put that mirror in there and I didn't get no pulse and I mean I just ran into a state a shock. I didn't believe it. I grabbed my baby I run over to her mother's house.

- 27 -

. . .

I just didn't mean it to be like this that's all.  So help me God.

. . .

I wanta live.  I regret what I have done.  I'm not that kinda person
and Shalimein no matter what baby please, get well for me, good
Lord up above you know how I am.  Get well for Vargus, for me,
long as I know you all are all right I feel a lot better inside, because
only reason I'm making this statement is because no matter what I
say I can't bullshit myself I can't live knowing I done what I done.

While Hooks' taped confession might not have accomplished all that Hooks claims he would have by testifying at trial, we believe the jury was exposed to his claims that he loved Shalimein, that he never meant to kill her, that he was anguished when he realized how badly he had beaten her, and that he attempted to get help for her instead of running away.  In light of the fact that the jury heard Hooks' "most important[]" message at trial, we conclude that he failed to carry his burden here to demonstrate that in the absence of his trial attorney's advice not to testify he would have testified and the jury would have "concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.[9]  Accordingly, the Oklahoma Court of Criminal

---

[9]The jury also heard testimony that Hooks earlier had threatened to kill one of his "bitches" that he maintained for prostitution; that he didn't want any of his "bitches" to have more than one child; that he had threatened Shalimein to kick this second fetus "out her ass" and similar evidence.  The medical examiner

(continued...)

- 28 -

Appeals decision rejecting Hooks' claim of ineffective assistance of counsel for advising Hooks not to testify at sentencing was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

## 2. Did Hooks' appellate counsel render ineffective assistance by failing to raise or adequately brief certain issues?

Hooks claims that the two lawyers who represented him in his state direct appeal, Robert Boren ("Boren") and Patrick Lavelle ("Lavelle"), provided ineffective assistance by (1) failing to raise "critical issues," and (2) insufficiently researching and briefing the issues that they did raise. He first raised this claim in his application for state postconviction relief. There, the Oklahoma Court of Criminal Appeals held that Hooks' appellate counsel were not constitutionally ineffective under Strickland. Hooks II, 902 P.2d at 1123-24. We conclude that the state court's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

---

[9](...continued)
concluded that Shalimein had received "multiple blunt force injuries to the head, chest, arms, back, abdomen [and] vagina."

a.  Failure to raise a critical issue.

The only "critical issue" that Hooks claims Boren and Lavelle failed to raise was a claim of prosecutorial misconduct arising from improper statements made by District Attorney Macy during opening and closing arguments comparing Hooks to Charles Manson, which Hooks claims "inflam[ed] and prejudic[ed]" the jury.  "After thoroughly reviewing" this issue, the Oklahoma Court of Criminal Appeals concluded that it did not "warrant relief."  Hooks II, 902 P.2d at 1124.  The federal district court "assumed without deciding that Boren and Lavelle acted unreasonably and that their performance on appeal was indeed deficient," but nevertheless concluded that "Hooks is not entitled to relief . . . because he has failed to affirmatively demonstrate prejudice."

Ineffective assistance of appellate counsel claims are governed by the standards of Strickland.  See United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995).  When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue.  Id.  "If the omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel."  Id. at 393 (quotation omitted).

In his half-page argument before this court, Hooks makes little effort to develop the merits of his claim of prosecutorial misconduct underlying his claim of ineffective assistance of appellate counsel.  However, divining his argument

- 30 -

from other portions of his appellate brief, we understand Hooks to claim that the prosecutors acted outrageously by "paint[ing] a picture of Mr. Hooks as another 'Charles Manson,' asserting that Mr. Hooks had purposefully cut a cross into Shalimein's forehead and 'Helter Skelter' was his favorite movie." Hooks argues that his jury was inflamed, and he was prejudiced, by prosecutorial attempts to link "Hooks to the infamous mass murderer Charles Manson and the circumstances of Shalimein's death to that of Sharon Tate." Specifically, Hooks contends that the following remarks by District Attorney Macy constituted prosecutorial misconduct:

> Shanna [Dinh, a prosecution witness] will further tell you that Helter Skelter was Hooks' favorite movie, that he watched it a lot on VCR. In that movie Charles Manson shaved the head of his victim, Sharon Tate, cut a cross in her forehead and killed her unborn child. (opening statement of Mr. Macy.)

> [Hooks] took a razor and cut of[f] most of her hair and cut a cross in her forehead and killed her baby, just as Charlie Manson did in Helter Skelter. (opening statement of Mr. Macy.)

> What about the cross on the forehead and the shaving of the head, so consistent with what Shanna [Dinh] told you about the movie Helter Skelter and Charlie Manson. (closing argument of Mr. Macy.)

Hooks correctly points out that District Attorney Macy's opening remarks contain inaccuracies. First, Dinh never testified that Helter Skelter was Hooks' favorite movie. At trial, she said only: "I watched [Helter Skelter] with him once. I don't know how many times he's watched it." Second, District Attorney

Macy's accounts of Helter Skelter's depiction of the murder of Sharon Tate was inaccurate.

District Attorney Macy's reference to Manson during his closing argument did not make any inaccurate characterizations of witness testimony. In closing, District Attorney Macy did not claim that Dinh testified that Helter Skelter was Hooks' favorite movie. He merely made reference to a cross on Shalimein's forehead and the fact that her hair had been shaved, then stated that those elements were consistent with what Dinh had testified to regarding the film. In fact, Dinh stated at trial, "all the women in the movie had their heads shaved and had a cross right here on their forehead." As to the accuracy of these characterizations of Shalimein's physical appearance, we note only that post-mortem photographic evidence admitted at trial provides an arguable basis that Shalimein had a small cross cut into her forehead and had a significant amount of her hair shaved.

Because Hooks' trial lawyer did not object to District Attorney Macy's remarks at trial,[10] under Oklahoma law, these claims would have been reviewed

---

[10]In a separate argument of ineffective assistance of trial counsel (which we have remanded to the district court), Hooks asserts that his trial counsel performed unreasonably by failing to object to District Attorney Macy's remarks. At the federal evidentiary hearing, when asked about why he did not object to the prosecutor's remarks, Hooks' trial counsel stated that he believed it was good strategy not to object during opening or closing statements. He said: "I think it

(continued...)

on appeal only for fundamental error. The Supreme Court has "recognized, it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citation and internal quotations omitted).

Here, in light of the evidence presented at trial we cannot say that the prosecutor's unnecessary and inaccurate references to Charles Manson and "Helter Skelter" so prejudiced the jury as to have denied Hooks due process. The references were neither so far off the actual evidence nor so central to the prosecutor's case that they were likely to have affected the jury's verdicts. Furthermore, we note that the jury here was specifically instructed to decide the case only on the evidence introduced at trial.

Because Hooks has failed to establish that his claim of prosecutorial misconduct is "clearly meritorious," his appellate lawyers were not constitutionally ineffective for failing to raise it on direct appeal.

---

[10](...continued)
looks bad to the jury. The thinking, the conventional wisdom is that if you stand to your feet everytime there is anything remotely off color [then] you are going to appear to be a whiner to the jury and you are afraid of the truth coming out."

- 33 -

b.  Inadequate appellate brief.

As a general matter, Hooks claims that Boren and Lavelle were untrained and inexperienced in death penalty appellate work.  Hooks complains that the brief his state direct appeal lawyers filed was only "eighteen pages long and cited only four federal cases."  Hooks specifically identifies three issues raised in his direct appeal which he argues were insufficiently briefed for the Oklahoma Court of Criminal Appeals.  First, he claims that his direct appeal brief inadequately attacked the three aggravating circumstances which the jury found because the brief failed to challenge the constitutionality of the aggravators.  Second, Hooks claims that his appellate lawyers performed deficiently by failing to cite Beck v. Alabama, 447 U.S. 625 (1980), in support of his claim that the trial court should have instructed the jury on lesser included offenses.  Third, Hooks asserts his appellate lawyers were constitutionally ineffective in not citing Strickland in support of his claim that he received ineffective assistance of trial counsel when his lawyer advised him not to testify at trial.  Even assuming that Hooks' appellate counsel provided representation below the constitutionally required level, Hooks cannot demonstrate prejudice because elsewhere in this opinion we reject on the merits all three issues that Hooks claims his appellate lawyers should have researched and briefed more thoroughly.  Therefore, his claim of ineffective assistance of appellate counsel fails.

**III. Whether Hooks was denied his right to due process by the trial court's refusal to instruct the jury on lesser included offenses.**

Predicated on Beck v. Alabama, 447 U.S. 625 (1980) and Schad v. Arizona, 501 U.S. 624 (1991), Hooks claims that he was denied his federal constitutional right to due process of law when the state trial court refused to instruct the jury on second degree murder and first degree manslaughter with respect to Shalimein. In his state direct appeal, Hooks made an analogous claim based only on a state law that required the trial court to instruct the jury on lesser included offenses supported by the evidence, which the Oklahoma Court of Criminal Appeals denied. See Hooks I, 862 P.2d at 1280. In his state application for postconviction relief, Hooks, for the first time, raised his federal constitutional claim under Beck. Based on "res judicata," the Oklahoma Court of Criminal Appeals refused to consider this claim because the court had previously resolved Hooks' related state law claims regarding lesser included instructions. See Hooks II, 902 P.2d at 1122 & n.7. While the Oklahoma Court of Criminal Appeals appeared to rely on state procedural bar in refusing to consider Hooks' Beck claim, the appellee has never asserted procedural bar as a defense on federal habeas. As such, we will consider Hooks' Beck claim on the merits, as did the federal district court, which denied it based on a finding that there was "not sufficient credible evidence, admitted and/or omitted, that would support a finding that Hooks acted without deliberate intent on October 6, 1988."

- 35 -

A.  Standard of Review

At the outset, we must consider the appropriate standard of review.  As noted, the Oklahoma courts never considered Hooks' federal constitutional claim with regard to his requested instructions on lesser included offenses.  Consequently, that claim was not "adjudicated on the merits in State court proceedings," as contemplated by the new § 2254(d).  Without a state court adjudication on the merits as to this claim, we cannot apply the § 2254(d) standard of "contrary to" or "unreasonable application of" clearly established Supreme Court law.  In the absence of a state court adjudication on the merits we believe we must apply the standard of review that predated the recent amendments to § 2254.  Prior to AEDPA, we reviewed de novo both pure questions of law and mixed questions of law and fact.  See Hatch v. State of Oklahoma, 58 F.3d 1447, 1453 (10th Cir. 1995).  Because the Oklahoma Court of Criminal Appeals made some factual determinations that may bear on this issue, we note that "a determination of a factual issue made by a State court, shall be presumed to be correct."  28 U.S.C. § 2254(e)(1) (post-AEDPA).

The appellee argues "that the trial court's failure to give the requested instructions did not violate Beck," because (1) "Beck is inapplicable to Oklahoma's statutory scheme," and (2) "the evidence did not support the giving of the lesser included instructions."

The threshold question thus is whether the rule of Beck v. Alabama applies to Hooks, in light of the discretion afforded in Oklahoma to the jury at the sentencing phase of this trial. Because we answer this question in the affirmative, we go on to consider whether the evidence adduced at trial supported either second degree murder or first degree manslaughter as to Shalimein Blaine. Because we answer this question in the negative, we affirm.

B. Applicability of *Beck v. Alabama*

In Beck, the Supreme Court held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627 (quotation omitted). Beck involved a challenge to an Alabama procedure that forbade the state trial judge in a capital case "from giving the jury the option of convicting the defendant of a lesser included offense," and that required the jury to "fix the punishment at death" if it found the defendant guilty. Id. at 628 & n.3. The Court noted that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case." Id. at 638. Concluding that the Alabama procedure "interjects irrelevant

- 37 -

considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime," the Court held that a death sentence could not be imposed under these conditions. Id. at 642, 645.

Since Beck, the Supreme Court has discussed its holding in a handful of cases raising Beck issues. Two years after Beck was decided, the Court explained: "Our opinion in Beck stressed that the jury was faced with a situation in which its choices were only to convict the defendant and sentence him to death or find him not guilty. The jury could not take a third option of finding that although the defendant had committed a grave crime, it was not so grave as to warrant capital punishment." Hopper v. Evans, 456 U.S. 605, 609 (1982). In Hopper, the Supreme Court reiterated that lesser included instructions were only mandated when supported by the evidence, see id. at 611, and therefore the Court upheld a conviction under the same Alabama law that was at issue in Beck because, under the facts of that case, there was no evidence to support a lesser included instruction. See id. at 612-13.

In Spaziano v. Florida, 468 U.S. 447 (1984), the Supreme Court held that a defendant was not "entitled to the benefit of both lesser included offense instruction[s under Beck] and an expired period of limitations on those offenses."

Id. at 454. Spaziano refused to waive his statute of limitations defense as to the lesser-included offenses, thus the trial court instructed only on capital murder. See id. at 450. After the jury found him guilty and the trial court sentenced him to death (disregarding the jury's advisory recommendation for life imprisonment), Spaziano challenged the trial court's decision to force him into a choice between availing himself of his right to instructions on lesser included offenses and his right to defend against them on the basis of expired statutes of limitations. The Supreme Court responded as follows:

> The Court in Beck recognized that the jury's role in the criminal process is essentially unreviewable and not always rational. The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In Beck, the Court found that risk unacceptable and inconsistent with the reliability this Court has demanded in capital proceedings. The goal of the Beck rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence. Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted, however, would simply introduce another type of distortion into the factfinding process.

Id. at 455-56 (citations omitted). Thus, the Court concluded that "the defendant [should] be given the choice" between the benefit of lesser included offense instructions and asserting statute of limitations defenses as to those offenses. See id. at 456.

In Schad v. Arizona, the Supreme Court stated that "[o]ur fundamental concern in Beck was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." 501 U.S. at 646 (1991). There, the Court upheld a conviction where the jury had been instructed on both first degree murder and the lesser included offense of second degree murder, but was not instructed on the lesser included offense of simple robbery, which also was arguably warranted under the evidence. The Court ruled that the Beck requirement was satisfied so long as the jury had the option of at least one lesser included offense which was supported by the evidence. See id. at 647-48.

Last year, in Hopkins v. Reeves, 118 S. Ct. 1895 (1998), the Court held that Nebraska was not constitutionally required to give an instruction on the non-capital charge of second degree murder when the defendant was charged with the capital count of felony murder because, under Nebraska law, second degree murder is not a lesser included offense of felony murder. The reason Nebraska holds that second degree murder is not a lesser included offense of felony murder is because the former requires an intent to cause death, whereas the latter does not. The Court explained that since second degree murder requires proof of an element (intent to cause death) that is not required as an element of the crime of

felony murder it is not a lesser included offense (even though "proof of a culpable mental state with respect to the killing" is a required element for imposition of the death penalty for the capital offense of felony murder under Tison v. Arizona, 481 U.S. 137 (1987) and Enmund v. Florida, 458 U.S. 782 (1982)). See Hopkins, 118 S. Ct. at 1902.

As a result, the Supreme Court upheld a conviction for felony murder (and the subsequent death penalty that was imposed by a separate three-judge panel) even though the jury at the guilt phase was given no option to find the defendant guilty of a non-capital crime. The Court held that under Nebraska law there was no lesser included offense to felony murder and that Beck did not entitle a defendant to an instruction on a non-capital offense if it was not genuinely a lesser included offense under state law. See id. at 1900-03

In distinguishing Beck, the Supreme Court said the following:

[T]he Court of Appeals again overlooked significant distinctions between this case and Beck. In Beck, the death penalty was automatically tied to conviction, and Beck's jury was told that if it convicted the defendant of the charged offense, it was required to impose the death penalty. See Beck v. Alabama, 447 U.S., at 639, n. 15, 100 S. Ct., at 2390 n. 15. This threatened to make the issue at trial whether the defendant should be executed or not, rather than "whether the State ha[d] proved each and every element of the capital crime beyond a reasonable doubt." See id., at 643, n. 19, 100 S. Ct., at 2392, n. 19. In addition, the distortion of the trial process carried over directly to sentencing, because an Alabama jury unwilling to acquit had no choice but to impose the death penalty. There was thus a significant possibility that the death penalty would be imposed upon defendants whose conduct did not merit it, simply because their

juries might be convinced that they had committed some serious crime and should not escape punishment entirely.

These factors are not present here. Respondent's jury did not have the burden of imposing a sentence. Indeed, with respect to respondent's insanity defense, it was specifically instructed that it had "no right to take into consideration what punishment or disposition he may or may not receive in the event of his conviction or ... acquittal by reason of insanity." App. 24. In addition, the three-judge panel that imposed the death penalty did not have to consider the dilemma faced by Beck's jury; its alternative to death was not setting respondent free, but rather sentencing him to life imprisonment. [FN7]

FN7. We are not, of course, presented with a case that differs from Beck only in that the jury is not the sentencer, and we express no opinion here whether that difference alone would render Beck inapplicable. The crucial distinction between Beck and this case, as noted, is the distinction between a State's prohibiting instructions on offenses that state law recognizes as lesser included, and a State's refusing to instruct on offenses that state law does not recognize as lesser included.

Hopkins, 118 S. Ct. at 1901-02.

Picking up on these distinctions noted in Hopkins, this court, in United States v. McVeigh, 153 F.3d 1166 (10th Cir. 1998), cert. denied, 119 S. Ct. 1148 (1999), rejected McVeigh's Beck claim, in part because "[t]his case is unlike Beck . . . because the jury here was not compelled to impose the death penalty on McVeigh if it convicted him of the charged offenses; rather, it had the opportunity to reject the death penalty during the sentencing phase." Id. at 1197 (citing Hopkins, 118 S. Ct. at 1901-02).

- 42 -

Although the McVeigh court did, thereby, point out a difference between the claims there presented and the holding of Beck, this distinction should not be elevated to a holding that Beck does not apply in any case where the convicting jury later had the discretion to sentence the defendant to life, instead of death. Rather, a careful reading of McVeigh reveals that the real holding in that case was that the lesser included instructions sought by McVeigh were not constitutionally required because the offenses that he wanted submitted to the jury were not lesser included offenses as a matter of federal law. The McVeigh court, thereby, disposed of McVeigh's Beck claim by relying on Hopkins, which instructed that a defendant facing a capital charge has no constitutional right to an instruction on a non-capital offense if such offense is not a lesser included offense of the capital charge.

The subsequent language in McVeigh pointing out a distinction between McVeigh's claim for a lesser included instruction and the defendant's claim for a lesser included instruction in Beck was not necessarily dispositive, nor was it necessary once it was concluded that the other offenses on which McVeigh wanted the jury instructed were not lesser included offenses.

Indeed Tenth Circuit cases prior to McVeigh had consistently applied a Beck analysis in situations where conviction of a capital offense did not automatically result in the death penalty. In fact, all of our pre-McVeigh death

penalty cases that arose out of Oklahoma involved a procedure whereby, following conviction of a capital offense, the jury still had to weigh aggravating and mitigating circumstances before selecting the death penalty. Nevertheless, in each of those cases we applied a full Beck analysis and continued to state, even under those procedures, that a capital defendant had a constitutional right to a lesser included offense instruction if there was evidence supporting a lesser included offense. None of these cases suggested that the subsequent sentencing discretion to give life imprisonment rather than death in any way mitigated or abrogated the Beck duty to instruct on lesser included offenses if the evidence warranted it. See Duvall v. Reynolds, 139 F.3d 768, 785-87 (10th Cir.) (denying Beck claim on the merits because "evidence did not support an instruction on murder in the second degree or manslaughter in the first degree"), cert. denied, 119 S. Ct. 345 (1998); Hatch v. State of Oklahoma, 58 F.3d 1447, 1454 (10th Cir. 1995) (denying Beck claim on the merits because "there is not evidence, which, if believed, could reasonably have led to a verdict of guilt of a lesser offense" (internal quotation omitted)); Parks v. Brown, 840 F.2d 1496, 1499-1502 (10th Cir. 1987), rev'd on other grounds, 860 F.2d 1545 (10th Cir. 1988) (en banc), rev'd on other grounds sub nom. Saffle v. Parks, 494 U.S. 484 (1990) (same).[11]

_____

[11]See also Andrews v. Deland, 943 F.2d 1162, 1183-84 & n.31 (10th Cir. 1991) (refusing to consider Beck claim in state case arising out of Utah because

(continued...)

Although none of those cases explicitly addressed the argument that subsequent sentencing discretion might abrogate a <u>Beck</u> duty, the fact that they continued to apply <u>Beck</u>, notwithstanding their acknowledgment of the subsequent <u>sentencing</u> discretion to avoid the death penalty following conviction of a capital offense, suggests that pre-<u>McVeigh</u> Tenth Circuit precedent had already established that a defendant does not lose his rights under <u>Beck</u> to a lesser included offense instruction merely because the jury retained sentencing discretion to impose a punishment less than death. If those cases are so construed, then <u>McVeigh</u>'s alternative rationale for decision to the contrary could not be construed as precedential because one panel cannot disregard prior Tenth Circuit precedent. <u>See</u> <u>United States v. Foster</u>, 104 F.3d 1228, 1229 (10th Cir. 1997).

Similarly, Tenth Circuit cases after <u>McVeigh</u> have continued to apply a <u>Beck</u> analysis to the issue of whether a defendant is entitled to a lesser included offense instruction notwithstanding the fact that the jury in those cases retained discretion at the sentencing stage to give a penalty less than death. <u>See</u> <u>Walker v. Attorney General for the State of Oklahoma</u>, 167 F.3d 1339, 1349-50 (10th Cir.

[11](...continued)
habeas petitioner abused the writ, but stating: "Despite <u>Beck</u>'s narrow factual setting – a statute prohibiting an instruction on a lesser included offense in a capital case – <u>Beck</u> has been interpreted more broadly to establish a constitutional right to a lesser included offense instruction when the death penalty is imposed and the evidence warrants the instruction." (internal quotation omitted)).

1999) (evidence did not support a lesser included offense instruction); Stouffer v. Reynolds, 168 F.3d 1155, 1170-71 (10th Cir 1999) (same). The closest that any published Tenth Circuit case has come to reading McVeigh as abrogating Beck's requirements when a jury has discretion to give a sentence less than death is Johnson v. Gibson, 169 F.3d 1239 (10th Cir. 1999). However, the issue there was only whether defendant's counsel was inadequate for failing to raise a Beck claim on the direct state appeal, thereby establishing cause and prejudice to excuse state procedural bar such that the issue could be considered on federal habeas. In analyzing whether counsel's performance was deficient we asked whether the omitted claim was "clearly meritorious" or a "dead-bang winner." See id. at 1251. Citing McVeigh for the proposition that Beck is satisfied so long as the jury retains sentencing discretion to impose something less than the death penalty, we concluded that the Beck issue was not such a "dead-bang winner," thus the claim was procedurally barred. See id. That stops short of giving McVeigh the expansive reading sought by the appellee here. Instead, it only recognizes that the Beck interpretation advanced in McVeigh had sufficient viability that it was not deficient for Johnson's attorney to give Beck such a narrow reading.[12]

---

[12]There is a similar interpretation of McVeigh in Roberts v. Ward, No. 98-6066, 1999 WL 162751 (10th Cir. Mar. 25, 1999) (unpublished disposition). However, that is an unpublished order and judgment so it lacks precedential force and, in any event, that statement, once again, was only an alternative holding.

In order to avoid potential confusion on this issue, we now explicitly disapprove the language in McVeigh suggesting that Beck does not apply when a jury has sentencing discretion to issue a penalty less than death. Our careful review of this issue convinces us that such a reading of Beck and its progeny would be in error, and that a proper reading of Beck entitles a defendant in a capital case to a lesser included instruction when the evidence warrants it, notwithstanding the fact that the jury may retain discretion at sentencing to issue a penalty less than death.

Several considerations convince us of the continuing force of Beck, even in jurisdictions that permit sentencing discretion. First, much of the language of Beck and its progeny is directed toward the enhanced reliability at the guilt phase of a capital case accomplished by giving lesser included instructions supported by the evidence. While Beck drew heavily for analogy from the line of cases in which the Court "invalidated procedural rules that tended to diminish the reliability of the sentencing determination," the Beck Court added that "[t]he same reasoning must apply to rules that diminish the reliability of the guilt determination."[13] Beck, 447 U.S. at 638 (emphasis added). Throughout Beck, the

_____

[13]Another fact counseling against an excessive reliance on the fact that the Alabama jury in Beck lacked discretion at sentencing is that even under the scheme at issue in Beck, the judge retained discretion to sentence the defendant to a punishment less than death (life imprisonment). The jury, admittedly, did not

(continued...)

Court focuses on the reliability of the <u>conviction</u>. <u>See, e.g.,</u> <u>id.</u> at 637 ("For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense . . . the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted <u>conviction</u>." (emphasis added)).

This emphasis on the reliability of the <u>conviction</u> decision, as opposed to the <u>sentencing</u> consequences, continues in the Supreme Court cases following <u>Beck</u>. In <u>Hopper</u>, the Court noted that "our holding [in <u>Beck</u>] was that the jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every

---

[13](...continued)
know this fact, but the Supreme Court did when it issued its <u>Beck</u> opinion. <u>See</u> <u>Beck</u>, 447 U.S. at 629 ("If the defendant is convicted and the death penalty imposed [by the jury], the trial judge must then hold a hearing with respect to aggravating and mitigating circumstances; after hearing the evidence, the judge may refuse to impose the death penalty, sentencing the defendant to life imprisonment without possibility of parole."); <u>id.</u> at 630 ("The jury subsequently convicted [Beck] and imposed the death penalty; after holding a hearing with respect to aggravating and mitigating factors, the trial court refused to overturn that penalty."); <u>id.</u> at 632 n.7 (Under Alabama's death penalty scheme, "it is the judge and not the jury who does the actual sentencing."). <u>See also</u> <u>Hopkins</u>, 118 S. Ct. at 1900 n.4 (Under the Alabama procedures reviewed in <u>Beck</u>, "[i]f the jury imposed the death penalty, the trial judge had the authority to reduce the sentence to life imprisonment without the possibility of parole. The jury, however, was not instructed to this effect; rather, it was told that it was required to impose the death penalty if it found the defendant guilty."). The fact that there was sentencing discretion (albeit residing only in the judge and not the jury) to avoid death even after a capital conviction in these cases did not deter the Supreme Court from articulating and then reaffirming the holding that in a capital case a defendant has a constitutional right to jury instructions on a lesser included offense if the evidence warrants it.

case' in which 'the evidence would have supported such a verdict.'" 456 U.S. at 610. The Court further clarified that because lesser included instructions were required by due process "*only* when the evidence warrants such an instruction, [t]he jury's discretion is . . . channelled so that it may <u>convict</u> a defendant of any crime fairly supported by the evidence." <u>Id.</u> at 611 (first emphasis in original, second added); <u>Spaziano</u>, 468 U.S. at 455 ("The absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free."); <u>Schad</u>, 501 U.S. at 646 ("Our fundamental concern in <u>Beck</u> was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital <u>conviction</u> if the only alternative was to set the defendant free with no punishment at all." (emphasis added)).

Second, we are persuaded of the continuing viability of <u>Beck</u> even in jurisdictions that afford juries sentencing discretion following conviction of a capital offense because the Supreme Court and this court have continued to apply <u>Beck</u> to cases that have arisen in jurisdictions which permit sentencing discretion after a finding of guilt of first degree murder.[14] Thus, in <u>Spaziano</u>, the Court

---

[14]There is no clear consensus that we can derive from the other circuits. Some circuit courts of appeals have applied a <u>Beck</u> analysis even though the

(continued...)

addressed petitioner's <u>Beck</u> claim on the merits, despite the fact that the Court was well aware that Florida's sentencing scheme permitted the jury to recommend life instead of death.[15]  In <u>Schad</u>, the Court dealt head-on with the merits of petitioner's <u>Beck</u> claim, despite noting that after Schad was convicted of first degree murder, the judge sentenced him to death following sentencing hearing. <u>See</u> <u>Schad</u>, 501 U.S. at 629.  And just last year, in <u>Hopkins</u>, the Court addressed the merits of petitioner's <u>Beck</u> claim, despite explicitly acknowledging that the sentencing panel had the "alternative" of sentencing him to "life imprisonment." 118 S. Ct. at 1902 & n.7.

---

[14](...continued)
jurisdictions from which the appeals arose permit jury discretion to impose a sentence less than death following conviction of a capital offense.  <u>See</u> <u>LaGrand v. Stewart</u>, 133 F.3d 1253, 1262-63 (9th Cir.), <u>cert. denied</u>, 119 S. Ct. 422 (1998); <u>Ransom v. Johnson</u>, 126 F.3d 716, 724-26 (5th Cir.), <u>cert. denied</u>, 118 S. Ct. 361 (1997); <u>Kornahrens v. Evatt</u>, 66 F.3d 1350, 1354-55 (4th Cir. 1995).  Other circuit decisions, at least as an alternative holding, appear to have applied a standard similar to that which we are now disapproving — intimating that sentencing discretion vitiates the constitutional requirements recognized in <u>Beck</u>.  <u>See</u> <u>Livingston v. Johnson</u>, 107 F.3d 297, 312-13 (5th Cir.), <u>cert. denied</u>, 118 S. Ct. 204 (1997); <u>Blair v. Armontrout</u>, 916 F.2d 1310, 1326 (8th Cir. 1990); <u>see also</u> <u>O'Rourke v. Endell</u>, 153 F.3d 560, 571-74 (8th Cir. 1998) (in assessing a claim of ineffective assistance of counsel based on trial counsel's failure to request lesser included instructions, noting that jury found no mitigating factors at sentencing phase and opted for death instead of life belied a finding of prejudice under <u>Strickland</u>), <u>cert. denied</u>, 119 S. Ct. 1048 (1999).

[15]In fact, in <u>Spaziano</u>, the jury recommended life imprisonment and the sentencing judge disregarded the recommendation and sentenced the petitioner to death.  <u>See</u> 468 U.S. at 451-52.

Third, any assumption that discretion at the sentencing stage can make up for the lack of an option to convict of a lesser included offense supported by evidence at the guilt phase is a suspect assumption. For several reasons, the sentencing phase is an imperfect place for a jury to manifest doubt it may have had concerning an element of the offense of conviction. First, at the sentencing phase, much evidence that would have been inadmissible at the guilt phase is permitted to go before the jury. The effect of this sentencing phase evidence could be to cause the jury to forget any doubt it harbored at the guilt phase. Second, instructions at sentencing typically force the jury to focus on the evidence of aggravating and mitigating factors presented at sentencing, thus directing the attention of the jury away from any residual doubt about the elements of conviction. Finally, we note that jurors might experience a psychological difference at the sentencing stage, tending to cause them to place behind them any doubts they may have harbored at the conviction stage. In sum, a jury that gets to stage two based on an unreliable determination at stage one may not be able to convey accurately its doubt about guilt through its sentencing determination.

C. Application of *Beck v. Alabama*

Recognizing the continuing force of <u>Beck</u>, we now address Hooks' claim

that he was entitled to jury instructions on lesser included noncapital offenses.

With respect to causing Shalimein's death, at trial Hooks proposed two jury

instructions on first degree manslaughter[16] and one jury instruction on second

---

[16]Hooks' first proposed first degree manslaughter jury instruction reads:

The Defendant is charged with Murder in the First Degree. You are instructed that in addition to the State's having sumbitted [sic] evidence concerning the crime of Murder in the First Degree, evidence has also been introduced concerning the crime of Manslaughter in the First Degree.

The elements of Manslaughter in the First Degree are:

1) Death of a human;
2) When perpetrated without a design to effect death;
3) By means of a dangerous weapon

If you have a reasonable doubt of the Defendant's guilt on the charge of Murder in the First Degree, you must then consider the charge of Manslaughter in the First Degree.

(Accused's Requested Instruction No. 1.)

Hooks' second proposed first degree manslaughter instruction reads:

No person may be convicted of Manslaughter in the First Degree unless the State has proven beyond a reasonable doubt each element of the crime. These elements are

1. Death of a Human
2. Death was not excusable or justifiable
3. Inflicted by a dangerous weapon
4. Caused by the defendant

(continued...)

- 52 -

degree murder[17].  The trial judge refused to accept any of Hooks' proposed

instructions on first degree manslaughter or second degree murder, stating: "I

---

[16](...continued)
   5.  While defendant was in a heat of passion.

(Accused Requested Instruction No. 5.)

Moreover, Hooks requested the jury be instructed that:

You may find the Defendant guilty of any offense, the commission of
which is necessarily included in the crime charged.  In this case,
Manslaughter in the First Degree is a lesser included offense of
Murder in the First Degree.

(Accused's Requested Instruction No. 2.)

[17]Hooks' proposed instruction on second degree murder reads as follows:

   No person may be convicted of Murder in the Second Degree
unless the State has proven beyond a reasonable doubt each element
of the crime.  These elements are: First, the death of a human;
Second, occurring as a Result of an act or event which happened in
the commission of a felony; Third, caused by the defendant while in
the commission of a felony; Fourth, the elements of the Manslaughter
in the First Degree defendant is alleged to have been in the
commission of are as follows:

   1: Willful;
   2: Killing;
   3: Of an unborn quick child
   4: by any injury;
   5: Caused by the Defendant
   6: Committed upon the person of the mother of the child

(Accused Requested Instruction No. 6.)

don't think the evidence in this case warrants an instruction on Manslaughter in the First Degree or Murder in the Second Degree."[18]

In his direct state appeal, relying only on state law and not on <u>Beck</u>, Hooks claimed that "the trial court erred in refusing to instruct the jury on the offense of first degree manslaughter and second degree murder." <u>Hooks I</u>, 862 P.2d at 1280. Examining the evidence, the Oklahoma Court of Criminal Appeals concluded that there was no evidence to support either a first degree manslaughter instruction or a second degree murder instruction. <u>See</u> <u>id.</u> In his application for post-conviction relief, where he raised his constitutional lesser included argument under <u>Beck</u> for the first time, the Oklahoma Court of Criminal Appeals stated that it had "thoroughly considered and rejected" Hooks' lesser included claim on direct

---

[18]Thus, as to Shalimein, the trial court instructed the jury only on the elements of first degree murder, as follows:

No person may be convicted of MURDER IN THE FIRST DEGREE unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

FIRST: The death of a human;

SECOND: The death was unlawful;

THIRD: The death was caused by the defendant.

FOURTH: The death was caused with malice aforethought.

(Stage One Jury Instruction No. 5.)

appeal, and thus it refused to consider it on the grounds of "res judicata." See

Hooks II, 902 P.2d at 1122 & n. 7.[19]

Considering the Beck claim on federal habeas, the district court below held

that "[t]here is not sufficient credible evidence, admitted and/or omitted, that

would support a finding that Hooks acted without deliberate intent on October 6,

1988." While we ultimately affirm the district court's conclusion that Hooks is

not entitled to a writ of habeas corpus, because of the standard under 28 U.S.C.

§ 2254, we must first examine how the Oklahoma courts treated Hooks' lesser

included claim.

While the Oklahoma Court of Criminal Appeals never considered Hooks'

lesser included claim under Beck on the merits, we note the relevance of its

decision on direct appeal when considering a claim under state law for the lesser

including instructions that neither requested lesser included offense instruction

was supported by the evidence. The Oklahoma Court of Criminal Appeals stated:

"In the absence of any competent evidence supporting either first degree

manslaughter or second degree murder, we find no error in the trial court's refusal

to so instruct." Hooks I, 862 P.2d at 1280. We understand the basis of this

conclusion to be a mixed one of fact and Oklahoma state law. "Under 28 U.S.C.

---

[19]As noted at page 35, because the state did not assert procedural bar as a
defense to this claim, we proceed to the merits.

§ 2254(e)(1), we must afford a presumption of correctness to any factual findings underlying the conclusion that the evidence was insufficient to justify lesser included offenses instructions." Boyd v. Ward, No. 98-6309, 1999 WL 370418, at *7 (10th Cir. June 8, 1999).[20]  As best we can discern, the Oklahoma Court of Criminal Appeals reached its conclusion according to the following logic: (1) in order to warrant instructions on the lesser included offenses that Hooks requested there must be evidence introduced at trial tending to establish an absence of intent to commit murder; (2) under Oklahoma law, "'[a] design to effect death [i.e., premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed,'" Hooks I, 862 P.2d at 1280 (quoting 21 Okla. Stat. tit. 21, § 702), and; (3) Hooks failed to elicit at trial evidence of circumstances sufficient to "raise a reasonable doubt" that Shalimein's death was premeditated.  The first two steps are matters of state law on which we do not comment.  The third step is a factual finding entitled to a presumption of correctness, with regard to which we will find otherwise only if Hooks "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  We believe that Hooks has met his burden to rebut this general factual finding by the Oklahoma Court of Criminal Appeals.

---

[20]To the extent that this conclusion implicates Oklahoma state law, we note that, before this court, Hooks makes no claim that the Oklahoma Court of Criminal Appeals interpreted or applied state law erroneously.

- 56 -

We agree with Hooks that there was sufficient evidence adduced at his trial to put the issue of intent in doubt. From the outset of trial Hooks admitted that he caused Shalimein's death, and sought only to challenge the state's assertion that he did so intentionally. This is clear from Hooks' counsel's opening statement:

> There's only going to be one issue as far as the first stage of this trial. And that's what was going through Victor's mind as he was doing these things, because we don't dispute the fact that he beat his wife to death. We don't dispute that he did it.
>
> There's some things that you need to look at to decide whether he did it with malice aforethought, though. There are some things that you need to look at very hard to decide if he intended to kill her, because, ladies and gentlemen, I submit to you that's the issue in this case.
>
> I think at the close of the evidence, after you've heard all the evidence . . . you will see or you'll certainly have a reasonable doubt that there was no intention on Victor's part to kill a woman that he loved.
>
> And hopefully — and I've never said this before to a jury — but hopefully you'll find Victor guilty; you'll find him guilty of what he is guilty of. He's guilty of manslaughter for beating his wife to death.

At trial, Detective Eric Mullenix testified that Hooks, during the course of his confession, stated that he and Shalimein had a heated argument which escalated into the beating when Shalimein slapped Hooks. Further, Deputy Scott Cannon testified that Hooks told him "that he went off on her," indicating that Hooks beat Shalimein in a rage. This evidence of a spontaneous beating, in light

- 57 -

of the testimony that Hooks often beat Shalimein,[21] and his other girlfriends,[22] calls into doubt whether Hooks intended to kill Shalimein on this particular occasion, or instead merely intended to inflict another one of his ruthless beatings that had theretofore never caused the death of one of his girlfriends.

We are further convinced that the evidence at trial was sufficient to "raise a reasonable doubt [as to] whether" Hooks had "a design to effect death," by the evidence in support of the state's theory that Hooks beat Shalimein in order to induce a miscarriage of the child she was carrying. During the state's case-in-chief, the prosecution elicited testimony that Hooks had previously induced a miscarriage by beating one of his other girlfriends,[23] and that he had previously attempted to force Shalimein to miscarry by beating her.[24] Moreover, the

---

[21]At trial, Shalimein's mother, Virginia Plumley, testified that when Hooks came to her door seeking help on the night of the beating, she did not call for help because she "just thought it was one of the same old battles that they [Hooks and Shalimein] always had. They were always arguing and fighting. And she's come over a lot of times with bruises on her, and I figured it was just some more of their fights. I didn't think it was that serious." Moreover, Shanna Dinh testified that she had witnessed Hooks beat Shalimein on "several" occasions, including one prior occasion on which Hooks had beaten Shalimein with a "two-by-four."

[22]Shanna Dinh testified that Hooks had beaten her so severely that he induced a miscarriage. Further, Dinh testified that Hooks beat Carol Hill, another one of his girlfriends.

[23]Shanna Dinh testified that when she became pregnant for a second time, Hooks induced a miscarriage by beating.

[24]According to the testimony of Shanna Dinh, on the occasion when Hooks
(continued...)

testimony of Fred Jordan, the state's forensic expert and then-Chief Medical Examiner for the State of Oklahoma, on direct examination, emphasized the extent of the beating to Shalimein's abdominal area, indicating that Hooks focused on the part of Shalimein's anatomy carrying his unborn baby. We believe that this evidence could have supported a conclusion that Hooks intended to induce a miscarriage, but not kill Shalimein, and therefore it raises a reasonable doubt as to whether Hooks had a design to effect Shalimein's death.

Finally, Hooks' attempts to help Shalimein after the beating (e.g. cleaning Shalimein up in the bathtub, getting her mother for help, and driving her to the hospital), his "distraught" condition, and his statements to law enforcement personnel evincing his dismay at what he had done indicate that he might not have possessed the intent to kill her. The record is replete with testimony indicating that Hooks frantically sought help in getting Shalimein to the hospital after he beat her. (Testimony of Virginia Plumley and Amanda Blaine). Moreover, there were many statements admitted at trial indicating that Hooks was distraught after realizing the extent of the beating he had inflicted and its fatal result. (Testimony

---

[24](...continued)
beat Shalimein with a two-by-four, after pushing her down on a couch, Hooks spread her legs open kicked her in her vagina with cowboy boots, saying several times "I don't want this baby." Moreover, Amanda Blaine, Shalimein's sister, testified that she had heard Hooks tell Shalimein "that he wished that that baby would die and wished that baby would get killed inside of her because he didn't want it."

of Virginia Plumley, emergency medical physician Greg Johnston, Oklahoma City Police Officer Robert Ardle, and Oklahoma City Police Detective Randy Scott). While we acknowledge that Hooks' after-the-fact actions and emotions might indicate only remorse and regret, and not a lack of intent to kill Shalimein, the latter reading is also a possible interpretation. Thus the preceding evidence did raise a reasonable doubt as to Hooks' intent to kill Shalimein and it provides an adequate evidentiary basis for a potential lesser included instruction.

Appellee argues that "[b]oth heat of passion manslaughter and second degree murder requires that there be no intent to kill," and here the evidence was sufficient to establish Hooks' intent to kill Shalimein. This argument, however, rests on inverted logic, because in order to resolve a Beck claim, a court must focus on whether credible evidence admitted at trial warranted a lesser included offense, not whether the evidence was sufficient to prove the greater one. See Le v. State of Oklahoma, 947 P.2d 535, 546 (Okla. Crim. App. 1997) (rejecting the state's theory that a first degree heat of passion manslaughter "instruction is improper wherever there is evidence of intent." The court continued: "under that theory a heat-of-passion instruction would never be appropriate where there was evidence of malice murder. The question is whether, in addition to evidence of intent, there was evidence that [defendant] killed [the victim] with adequate

provocation, in a heat of passion, without the design to effect death."), cert.

denied, 118 S. Ct. 2329 (1998).

While we hold that the Oklahoma Court of Criminal Appeals erroneously

concluded that the evidence admitted at trial was insufficient to raise a reasonable

doubt as to Hooks' intent to kill, for the reasons below, we hold that under

Oklahoma law, Hooks was not entitled to any of the instructions that he tendered.

## 1.  Second degree murder

Under Oklahoma law, second degree murder encompasses both (i) reckless

"depraved mind" murder[25] and (2) felony murder.[26]  As Hooks' requested stage

---

[25]After initial briefing, oral argument, and supplemental briefing on the
Beck issue, the appellee filed a notice of supplemental authority advising this
court of the Oklahoma Court of Criminal Appeals' decisions in Welch v. State of
Oklahoma, 968 P.2d 1231 (Okla. Crim. App. 1998) and Willingham v. State of
Oklahoma, 947 P.2d 1074 (Okla. Crim. App. 1997), and arguing that second
degree depraved mind murder is not a lesser included offense of first degree
malice murder under Oklahoma law.  For two principal reasons, appellee's
supplemental authority fails to persuade us.  First, we do not accept a new
argument by way of notice of supplemental authority notices, and arguments not
raised in duly filed briefs are deemed waived.  Second, and more important, the
Oklahoma Court of Appeals decisions referenced in appellee's supplemental
authority memorandum post-date Hooks trial by over eight years, and as we
recently stated in Boyd, 1999 WL 370418, at *8, "[a]t the time of his trial . . .
[Oklahoma] courts treated second degree 'depraved mind' murder as a lesser
included offense of first degree malice murder."  Id. at 20 (citing Willingham,
947 P.2d at 1081).

[26]Murder in the second degree was defined under Oklahoma criminal
statutes in effect at the time of Hooks' trial as follows:

(continued...)

- 61 -

one jury instruction number 6 makes clear, Hooks asked for a second degree

murder instruction with regard only to felony murder. On the other hand, in his

federal habeas petition before the district court and before this court, Hooks has

argued only that a "depraved mind" second degree murder instruction was

warranted. Thus, although Hooks requested an instruction on felony murder

(second degree) before the trial court, because he has not predicated his federal

habeas Beck claim on an entitlement to a felony murder instruction, he has

abandoned that argument and we will not consider it. And, while Hooks argues

on federal habeas that he was entitled to an instruction on "depraved mind"

---

[26](...continued)
Homicide is murder in the second degree in the following cases:

1.    When perpetrated by an act imminently dangerous to another
      person and evincing a depraved mind, regardless of human
      life, although without any premeditated design to effect the
      death of any particular individual; or

2.    When perpetrated by a person engaged in the commission of
      any felony other than the unlawful acts set out in [the first
      degree murder section] of this act.

Okla. Stat. Ann. tit. 21, §701.8 (West 1983). "The Oklahoma Court of Criminal
Appeals adopted a specific definition of depraved mind in Palmer v. State, 871
P.2d 429, 431 (Okla. Crim. App. 1994): 'A person evinces a depraved mind when
he engages in imminently dangerous conduct with contemptuous and reckless
disregard of, and in total indifference to, the life and safety of another.'" Stouffer
v. Reynolds, 168 F.3d 1155, 1171 n.18 (10th Cir. 1999).

murder, because he failed to request an instruction on "depraved mind" second degree murder at trial, we cannot consider it on federal habeas review.

This court has never explicitly addressed the effect of failing to request a jury instruction for a lesser included offense on a subsequent Beck claim in the context of a federal habeas action.[27] Today we hold that a state prisoner seeking federal habeas relief may not prevail on a Beck claim as to a lesser included instruction that he or she failed to request at trial.

As the Eleventh Circuit has recognized: "Other circuits have held that when a defendant fails to request a lesser included offense instruction in a capital case, the district court does not err in failing to instruct on the lesser included offense." See United States v. Chandler, 996 F.2d 1073, 1099 (11th Cir. 1993) (federal death penalty case in which defendant at trial made no request for a non-capital lesser included offense instruction) (citing Kubat v. Thieret, 867 F.2d 351,

---

[27]We acknowledge that in one previous case this court apparently reviewed for "plain error" a Beck claim regarding jury instructions on lesser included offenses that the petitioner had not requested at trial. See Stouffer, 168 F.3d at 1070-71. In Stouffer, we stated: "Acknowledging counsel did not request the lesser-included offense instructions, Petitioner urges the failure amounts to plain error." Id. at 1170. We then considered petitioner's Beck claim despite his failure to request jury instructions on lesser included offenses at trial. However, from the opinion in Stouffer, it appears that the parties did not contest the proper standard of review and the court merely assumed without explicitly deciding the appropriate review standard. Accordingly, we view the issue of whether a state prisoner can raise a Beck claim on federal habeas as to a lesser included offense for which he failed to request an instruction at trial as an open question in this circuit.

365-66 (7th Cir. 1989); Look v. Amaral, 725 F.2d 4, 8-9 (1st Cir. 1984)). Given principles of comity, we believe this rule applies with even greater force when we sit in review of a state conviction in a § 2254 action.

Beck requires that we reverse a conviction when the jury was prohibited by the sovereign, in this case the state of Oklahoma, from considering a verdict of guilt of a non-capital lesser included offense. While courts have applied the Beck rule equally to state legislative prohibitions, e.g. Beck, and court rulings refusing proffered jury instructions on lesser included offenses, when a defendant fails to request an instruction on a non-capital lesser included offense we cannot say that the sovereign has denied the jury the right to consider a conviction on a lesser included offense. In such cases, we think it is the defendant him- or herself that precludes the jury from considering a non-capital option, and we recognize that he or she may have valid strategic reasons for doing so.

As the Supreme Court has observed, "[a]lthough the Beck rule rests on the premise that a lesser included offense instruction in a capital case is of benefit to the defendant, there may well be cases in which the defendant will be confident enough that the State has not proved capital murder that he will want to take his chances with the jury." Spaziano, 468 U.S. at 456. Likewise the First Circuit has recognized that "[d]efense counsel may well have felt that, on the evidence, the jury would be more likely to convict on manslaughter than to acquit, but if given

a choice only between a murder conviction and acquittal that an acquittal was more likely. Nothing in <u>Beck</u> or elsewhere prevents a defendant from making such a strategic choice." <u>Look</u>, 725 F.2d at 9. Thus, unlike run-of-the-mill jury instruction claims where defendant neglects to object at trial to a given or refused instruction, which we review for plain error, in the context of instructions on lesser included offenses, we see particular strategy reasons why a defendant might not want to present the jury with a compromise opportunity.

Moreover, in the related context of whether a federal criminal defendant is entitled to a lesser included offense under Fed. R. Crim. P. 31(c),[28] this court has often held in noncapital cases involving direct appeals that a trial court does not err in refusing to give a lesser included instruction — even one supported by the evidence — if the defendant neglects to make a proper request for one at trial. <u>See</u> <u>United States v. Young</u>, 862 F.2d 815, 820 (10th Cir. 1988) ("Given the right facts, simple possession may well be a lesser included offense of possession with intent to manufacture. <u>But here the defendant failed to request the instruction. That alone bars him from claiming error on this point</u>." (emphasis added));

_____

[28]Fed. R. Crim. P. 31(c) reads:

> **(c) Conviction of Less Offense.** The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.

United States v. Duran, 127 F.3d 911, 914-15 (10th Cir. 1997), cert. denied, 118 S. Ct. 1389 (1998); Fitzgerald v. United States, 719 F.2d 1069, 1071 (10th Cir. 1983); United States v. Chapman, 615 F.2d 1294, 1299 (10th Cir. 1980); United States v. Coppola, 526 F.2d 764, 773 (10th Cir. 1975); but see United States v. Cooper, 812 F.2d 1283, 1286 (10th Cir. 1987) (upholding conviction on a lesser included offense that was instructed to the jury sua sponte by the court holding: "The trial judge must give instructions to the jury as required by the evidence and the law where the parties so request or not, and to do so although objections are made."); United States v. Arreola, 422 F.2d 869, 869 (10th Cir. 1970) (applying plain error to a claim that trial court erred in failing to give a lesser included instruction though none was requested). Likewise, a majority of other circuits have considered a "proper request" for a lesser included instruction to be an "essential" requirement under the federal rules. See David E. Rigney, Annotation, Propriety of Lesser-Included-Offense Charge To Jury In Federal Criminal Case — General Principles, 100 A.L.R. Fed. 481, 492-96, § 5 (1990) (citing cases from the First, Second, Fourth, Seventh, Eighth, Ninth, Tenth, and District of Columbia Circuits).

Finally, we believe this rule — precluding on federal habeas Beck review with regard to lesser included offenses as to which the defendant requested no instruction in state court — properly accounts for principles of federal-state

comity and affords state courts and their judgments proper respect.  Where a state

has in place a system by which a criminal defendant has a right to an instruction

on lesser included offenses supported by the evidence, as Oklahoma does, and the

defendant chooses not to request an instruction — thereby failing to alert the

court to the propriety of such an instruction — Beck does not require reversal on

federal habeas.[29]

In sum, while Hooks requested an instruction at trial on second degree

felony murder, he does not advance that argument before this court; thus we offer

no opinion as to that claim.  And, we are precluded from considering Hooks'

contention that he was entitled to an instruction on second degree depraved mind

murder because Hooks did not request such an instruction at trial.

## 2.  First degree manslaughter

Hooks also argues that under Beck, he was entitled to an instruction on first

degree manslaughter.  Under the Oklahoma criminal code in effect at the time of

Hooks' crime and trial, first degree manslaughter was defined, in pertinent part,

as: "Homicide . . . [w]hen perpetrated without a design to effect death, and in a

---

[29]We do not preclude the possibility that Beck would require reversal where
the failure to request a jury instruction on lesser included non-capital offenses
resulted from ineffective assistance of counsel.  In this case, Hooks has not
alleged that his trial counsel was ineffective for failing to request an instruction
on "depraved mind" second degree murder.

heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." Okla. Stat. Ann. tit. 21, § 711(2) (West 1983). Hooks' requested stage one jury instruction number 5 includes all the elements of first degree manslaughter and was duly presented to the trial court.[30]

Hooks argues that an instruction on first degree manslaughter was warranted because the evidence adduced at trial could have supported a finding that Hooks did not intend to kill Shalimein. The appellee argues that heat of passion manslaughter "affirmatively require[s] that there be no intent to effect death. Thus, the presence of an intent to kill does not simply support the States's theory, it prevents a conviction under [first degree manslaughter]." Appellee's statement appears to be an accurate reflection of Oklahoma law; as the Oklahoma Court of Criminal Appeals explained in Brown v. State of Oklahoma, 777 P.2d 1355 (Okla. Crim. App. 1989):

> Most jurisdictions hold that first degree or voluntary manslaughter involves an intent to kill accompanied by the "extenuating circumstance . . . that the defendant, when he killed the victim, was in a state of passion engendered in him by an adequate provocation

---

[30]While we note that Hooks' proffered instructions on first degree manslaughter were inartfully drafted and included elements that were not part of a first degree manslaughter offense under Oklahoma law, the appellee has not challenged the proffered instruction on this ground, and thus we proceed to analyze, under the proper standard, whether the evidence adduced at trial warranted an instruction on first degree heat-of-passion manslaughter.

> (i.e., a provocation which would cause a reasonable man to lose his normal self-control)." W. LaFave & A. Scott, Jr., <u>Substantive Criminal Law</u> § 7.10, at 252 (1986) (footnote omitted). However, <u>Oklahoma</u>, like South Dakota, falls within the minority view which <u>requires that the homicide be perpetrated "without a design to effect death" to constitute first degree or voluntary manslaughter</u>. <u>Id.</u> at 254. <u>See</u> 21 O.S. 1981, § 711(2).

<u>Id.</u> at 1358 (emphasis added). Thus, under Oklahoma law, in order to mitigate murder to first degree manslaughter, a defendant had to perpetrate the homicide (1) without intent to cause the death, and (2) in a heat of passion.[31]

The appellee's argument on appeal focuses on the intent element. In this case, we agree with Hooks that evidence both introduced at trial and proffered but excluded at trial[32] could support a finding that the homicide was committed "without the design to effect death." <u>See</u> <u>supra</u>, pp. 59-62. However, because we find that the admitted and proffered evidence at trial was insufficient to establish

---

[31] A third requirement is that the defendant caused the death either in a cruel and unusual manner or by means of a dangerous weapon. <u>See</u> Okla. Stat. Ann. tit. 21, § 711(2).

[32] As noted in the Background Section, the district court granted Hooks a COA on the issue of whether he was denied his right to a fair trial when the trial court excluded the expert testimony of Dr. Philip J. Murphy, proffered to show that Hooks did not intend to kill Shalimein. Before this court, Hooks does not press this as an independent claim. Instead, he argues that exclusion of Dr. Murphy's testimony hindered his efforts to demonstrate that Hooks did not intend to kill Shalimein. In essence, he argues that the evidence presented at trial, plus the evidence which was excluded (erroneously in his view) was sufficient to warrant an instruction on first degree manslaughter. We do not need to address the state court's evidentiary ruling under state law with respect to Dr. Murphy's testimony, because we agree with Hooks that the evidence that was adduced at trial was sufficient to conclude that Hooks lacked the intent to kill Shalimein.

"adequate provocation" under Oklahoma law, we conclude that the evidence did not warrant an instruction on first degree heat-of-passion manslaughter, and Hooks was consequently not denied his right to due process under Beck and its progeny when the trial court refused to instruct the jury on first degree manslaughter.

Not surprisingly, heat of passion is an element of heat-of-passion first degree manslaughter in Oklahoma. See Okla. Stat. Ann. tit. 21, § 711(2); Brown, 777 P.2d at 1357. The elements of heat of passion are: "[1] proof of adequate provocation, [2] the existence of a strong passion or an emotion such as anger, rage or resentment, [3] the lack of reasonable opportunity for the cooling of the passion and [4] a causal connection between the provocation, the passion and the homicide." Allen v. State of Oklahoma, 821 P.2d 371, 374 (Okla. Crim. App. 1991); Oklahoma Uniform Jury Instruction–Criminal Number [OUJI-CR No.] 456 (1982). Under the Oklahoma Uniform Jury Instructions in effect at the time of Hooks' trial and appeal:

> "Adequate provocation" refers to any improper conduct of the deceased toward the defendant(s) which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant(s). Generally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily [sic] provoke serious violence do not constitute adequate provocation. In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person of reasonable intelligence and

disposition would respond to it.  Mere words alone, or threats,
menaces, or gestures alone, however offensive or insulting, do not
constitute adequate provocation.  However, words, threats, menaces,
or gestures, when considered in connection with provoking conduct
of the deceased, may constitute adequate provocation.  Personal
violence or aggression by the deceased of a nature sufficiently
violent to cause or threaten to cause pain, bloodshed, or bodily harm
to the defendant(s) may be adequate provocation.

OUJI-CR No. 457 (emphasis added); see also Valdez v. State of Oklahoma, 900

P.2d 363, 377 & nn.57-59 (Okla. Crim. App. 1995) (quoting and discussing OUJI-

CR No. 457 with approval).

From the trial record, the only provocation for the beating Hooks inflicted

upon Shalimein was a verbal argument between Hooks and Shalimein which

culminated in Shalimein slapping Hooks.  Detective Mullenix testified that during

the course of his confession Hooks explained that he and Shalimein argued and

exchanged "harsh words," before Shalimein "slapped him in the face."  At that

point, Detective Mullenix continued: "He said that he then struck her with his fist

and that she fell on to the floor by the bed.  He said that he then kicked her in the

stomach and then in the face."  The written transcript of Hooks' taped confession

given in the early morning hours following the beating paints a similar picture.

With this factual setting in mind we turn to whether such provocation was

"adequate" to cause a heat of passion — i.e., whether Shalimein engaged in

"improper conduct . . . which naturally or reasonably would have the effect of

arousing a sudden heat of passion within a reasonable person in the position of

the defendant." OUJI-CR No. 457. First, we observe that the verbal argument was inadequate provocation. See id. ("Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation."). Thus, the only potential "adequate provocation" for Hooks' rage must arise from Shalimein's slap or the slap in the context of the argument. However, as to that slap, Hooks told police that "she slapped me, <u>not intentionally to hurt me or nothing like that</u>." The full confession makes it clear that the real provocation, and the real reason Hooks beat and stomped Shalimein to death, was his anger that she would not help him out financially. In light of the Oklahoma cases we have reviewed,[33] we find that Shalimein's conduct would not naturally and reasonably provoke Hooks' violent response in a "person of reasonable intelligence and disposition," OUJI-CR No. 457. Thus, the evidence adduced at trial was insufficient to warrant an instruction on first degree heat-of-passion manslaughter under Oklahoma law. Accordingly, Hooks was not deprived of his

---

[33]Compare Le, 947 P.2d at 546 (victim picking up a bar and threatening or striking the defendant was "not adequate provocation for heat-of-passion manslaughter"), and Conover v. State of Oklahoma, 933 P.2d 904, 917 (Okla. Crim. App. 1997) ("The breaking of the window as the victim ran by the . . . home [of appellant's friend] does not provide adequate provocation for Appellant's act of chasing the victim down and restraining him while multiple stab wounds were inflicted."), with Williams v. State of Oklahoma, 513 P.2d 335, 338 (Okla. Crim. App. 1973) (wife's "sudden and unexpected attempt to attack defendant [husband] with a pair of scissors" could be adequate provocation).

right to due process under <u>Beck</u> and its progeny, and we affirm the district court's denial of the writ of habeas corpus on this claim.

**IV.    Whether sentencing stage instructions regarding aggravating circumstances were unconstitutional.**

Under Oklahoma law, in order to impose a sentence of death, a jury must unanimously find (1) at least one of the statutory aggravating circumstances beyond a reasonable doubt, and (2) that the/those aggravating circumstance(s) is/are not outweighed by mitigating circumstances. <u>See</u> Okla. Stat. Ann. tit. 21 § 701.11. After the sentencing hearing, Hooks' jury found three aggravating circumstances beyond a reasonable doubt:

1.    The defendant was previously convicted of a felony involving the use or threat of violence to the person.

2.    The murder of Shalimein Blaine was especially heinous, atrocious or cruel.

3.    The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

On direct appeal, Hooks challenged only the sufficiency of the evidence supporting the three aggravating circumstances. The Oklahoma Court of Criminal Appeals found that sufficient evidence supported each aggravating circumstance, and thus denied Hooks' assignment of error. <u>See</u> <u>Hooks I</u>, 862 P.2d at 1282-83. In his application for postconviction relief, Hooks challenged the constitutionality

of each of the aggravators. The Oklahoma Court of Criminal Appeals considered the issue barred by the doctrine of "<u>res judicata</u>" because it had previously rejected Hooks' sufficiency claims related to the aggravators. See <u>Hooks II</u>, 902 P.2d at 1122 & n.8.[34]

On federal habeas, Hooks renews his challenge to the constitutionality of three of the aggravating factors. The district court rejected Hooks' claims regarding the constitutionality of the aggravating factors. Because Hooks' claims that the aggravators are unconstitutional were not "adjudicated on the merits in State court proceedings," the new standard articulated in § 2254(d) does not govern our review. Instead we apply our pre-AEDPA standard, and review these questions of law de novo. See <u>Castro v. State of Oklahoma</u>, 71 F.3d 1502, 1510 (10th Cir. 1995).

A. Continuing Threat Aggravating Circumstance

Hooks claims that Oklahoma's continuing threat aggravating circumstance violates the Eighth Amendment because it fails to narrow the class of convicted murderers that are sentenced to death and because it is unconstitutionally vague. See <u>Tuilaepa v. California</u>, 512 U.S. 967, 972 (1994).

_____

[34]Once again, appellee fails to assert procedural bar and, accordingly, we proceed to the merits of this claim.

This court reaffirmed its position that "the continuing threat aggravator as applied in the Oklahoma sentencing scheme does not violate the Eighth Amendment." Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999) (citing Castro v. Ward, 138 F.3d 810, 816 (10th Cir.), cert. denied, 119 S. Ct. 442 (1998); Nguyen v. Reynolds, 131 F.3d 1340, 1352-54 (10th Cir. 1997), cert. denied, 119 S. Ct. 128 (1998)). Hooks acknowledges that "this Court rejected a similar argument raised in Nguyen"; however, he states that he "respectfully disagrees with the panel's decision in that case and requests this Court revisit the issue." Hooks advances a number of grounds that he claims the Nguyen court overlooked in its Eighth Amendment analysis. However, he fails to acknowledge our decision in Castro, which disposed of almost identical claims in reaffirming Nguyen. See Castro, 138 F.3d at 816. As the Ross court noted as to this issue, "we are bound by these decisions." Ross, 165 F.3d at 800 (citing Foster, 104 F.3d at 1229 ("a three-judge panel cannot disregard or overrule circuit precedent")). Given this circuit's precedent, the district court properly found that Hooks' constitutional rights were not violated by Oklahoma's use of the continuing threat aggravating circumstance, and we affirm.

B. Double Counting — "Prior Violent Felony" Aggravating Circumstance

Hooks claims that his right to due process was violated because the jury relied upon the same evidence to find two separate aggravating circumstances.[35] The district court properly recognized that "'[d]ouble counting' of one fact to support two aggravating circumstances unconstitutionally skews the weighing process." As the Tenth Circuit has explained: "[D]ouble counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." United States v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996).

Here, Hooks does not challenge the fact that at the time of sentencing he had a prior conviction for robbery with a firearm, nor does he dispute that his prior conviction qualifies as a prior violent felony under Okla. Stat. Ann. tit. 21 § 701.12(1). Instead, his argument is that evidence of his prior violent felony conviction was used to support both the "prior violent felony" aggravating factor and the "continuing threat" aggravating factor in violation of McCullah. However, Hooks points to no evidence to support his assertion that "[i]n this case

---

[35]Appellee argues that because Hooks failed to raise his challenge to the continuing threat aggravator in state court, he has failed to exhaust this claim. Because we find Hooks' claim to be without merit, we deny it on the merits, notwithstanding Hooks' failure to exhaust state remedies. See 28 U.S.C. § 2254(b)(2).

there can be no doubt the jury used Mr. Hooks's robbery conviction to find both the 'continuing threat' and 'previous conviction for a felony involving violence' aggravating circumstance."

In rejecting Hooks' double-counting claim, the district court found that "while Hooks' prior conviction alone supported the 'previous conviction of a felony' aggravator, there was other evidence, aside and apart from the robbery conviction, to support the 'continuing threat to society' aggravator." The district court alluded to evidence presented to the jury demonstrating Hooks' sexual predatory nature and his propensity for violence, independent of his prior violent felony conviction. Here, unlike in McCullah, the two aggravating factors that Hooks claims were double counted, did not "by definition" overlap. As the district court found, "[e]ach of these two aggravators was supported by independent evidence"; therefore, we affirm.

## C. Heinous, Atrocious, or Cruel Aggravating Circumstance

Hooks claims that the "heinous, atrocious, or cruel" aggravating circumstance, as it was described to, and applied by, the jury, was unconstitutional because it did not narrow the class of convicted murderers eligible for sentences of death. Hooks' jury received the following guidance on the meaning of "heinous, atrocious, or cruel":

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

(Instructions of the Court, Stage Two, No. 5.)

While Hooks claims that this instruction failed properly to narrow the class of death eligible first-degree murderers, this court recently rejected an almost identical claim with regards to an almost identical instruction in Duvall v. Reynolds, 139 F.3d 768, 792-94 (10th Cir. 1998).

As this court observed in Duvall, "the Oklahoma Court of Criminal Appeals adopted a limiting construction of the 'especially heinous, atrocious, or cruel' aggravator, mandating that the murder involve 'torture of the victim or serious physical abuse.'" Id. at 793 (quoting Stouffer v. State of Oklahoma, 742 P.2d 562, 563 (Okla. Crim. App. 1987)). In Hatch v. State of Oklahoma, 58 F.3d 1447, 1468-69 (10th Cir. 1995), we held that such a limiting construction of the "especially heinous, atrocious, or cruel" aggravator was constitutionally permissible. See also Duvall, 139 F.3d at 793.[36]

_____

[36]Hooks acknowledges Duvall, "respectfully disagrees with the panel's decision in that case," and "requests [that] this Court revisit the issue." As noted

(continued...)

- 78 -

On Hooks' direct appeal, the Oklahoma Court of Criminal Appeals applied the limiting construction to the "especially heinous, atrocious, or cruel" aggravating factor. See Hooks I, 862 P.2d at 1282. The court stated that "the heinous, atrocious or cruel aggravating circumstance requires a showing that torture or serious physical abuse preceded the victim's murder." Id. This additional limiting factor has been interpreted to require that the murder victim be conscious during at least some portion of the attack. See Stouffer, 742 P.2d at 563-64.

While the court acknowledged that the pathologist who testified for the defense during the sentencing hearing "was unable to render an opinion concerning whether Ms. Blaine was conscious during the attack," it concluded that the testimony of Detective Eric Mullenix[37] and Shalimein's neighbor, David

_____

[36](...continued)
previously, one panel cannot overrule a previous panel. In addition, he argues that the Oklahoma's limiting construction of the "especially heinous, atrocious, or cruel" aggravating factor might serve to limit death eligible first degree murder convictions, but if the jury is never instructed on this limiting construction, the aggravating factor as described to and applied by the jury violates the Eighth Amendment because it is unconstitutionally vague. However, Hooks ignores the fact that here the jury was expressly given the limiting definition so there could not be any claim of vagueness in this case.

[37]At trial, Detective Mullenix testified as follows:

> [Hooks] said that he then struck her with his fist and that she fell on the floor by the bed. He said that he then kicked her in the stomach and then in the face. He said that they were — that she laid

(continued...)

Faske,[38] provided sufficient evidence upon which "a rational trier of fact could reasonably conclude that Ms. Blaine was conscious during at least some portion of the attack and that she suffered the requisite torture or serious physical abuse." Hooks I, 862 P.2d at 1282.

Hooks has failed to show a constitutional violation in the application of the "especially heinous, atrocious, or cruel" aggravating factor in his case. Accordingly, we affirm the district court's finding that "the 'serious physical abuse' standard has been met in this case."

---

[37](...continued)
there on the floor by the bed, and that she began to bleed, with blood coming out of her mouth and nose.

  He said that she then told him that she was hurt and that he picked her up off the floor and took her into the bathroom and put her in the bathtub. He then removed her clothing and began trying to clean her up and put all of her clothing into the trash can in the kitchen.

  He said that she then became unconscious and that he continued to tell her to wake up . . . .

Hooks' own statement to police (introduced at trial), confirms Detective Mullenix's testimony. See Hooks, No. CIV-96-732-M, at 37 (quoting Hooks' statement from the trial transcript).

[38]Mr. Faske lived across the hall from Ms. Blaine at the time Hooks beat her to death. He testified that on the evening of the incident he heard thumping every five or ten minutes from 5 P.M. until 7 P.M.

## CONCLUSION

We REMAND for the district court to evaluate the adequacy of the state's claim of procedural bar as to all but one of Hooks' claims of ineffective assistance of trial counsel. As to all other issues upon which a certificate of appealability has been granted, we AFFIRM.

**No. 98-6196, <u>Hooks v. Ward</u>**

Anderson, Circuit Judge, with whom Judge Tacha joins, concurring:

I join the opinion authored by Judge Ebel except for Section III C. As to that section, I disagree with Judge Ebel's conclusion that Hooks rebutted by clear and convincing evidence the factual finding by the Oklahoma Court of Criminal Appeals that Hooks failed to elicit evidence sufficient to call into question Hooks' intent to kill Shalimein. Furthermore, while I have no quarrel with the reasoning in Sections III C (1) and (2), I would find it unnecessary to reach those alternative holdings.